UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x
                                            :

In re Application of CHEVRON CORPORATION for   :
an Order Pursuant to 28 U.S.C. § 1782 to Conduct   :   Case No. M-19-111
Discovery for Use in Foreign Proceedings.            :

                                            :
------------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE* APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Attorneys for Applicant Chevron Corporation*

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................. 1

II. FACTUAL BACKGROUND ............................................................................... 6

    A. TexPet's Participation in State-Controlled Oil Operations in Ecuador, the Passage of the Environmental Management Act, and the Filing of the Lago Agrio Litigation and Treaty Arbitration ................................................................. 6

    B. Plaintiffs Falsify Evidence in, Then Abandon, the "Judicial Inspections" of the Former Concession Area ................................................................................. 7

    C. Cabrera, His Team, and Collusion with Plaintiffs on the Cabrera Report ............. 9

        1. Cabrera and His Team and the "Cabrera" Report ...................................... 9

        2. Cabrera and Plaintiffs' Undeniable Collusion. ........................................ 10

        3. Plaintiffs' and Donziger's Denials and Misrepresentations of Their Relationship with Cabrera ....................................................................... 13

    D. Donziger's Collusion with the Ecuadorian Government and the Pursuit of False Criminal Charges Against Chevron's Attorneys ....................................... 14

    E. Obstruction of Discovery in Related 1782 Proceedings ...................................... 15

III. SECTION 1782 ENTITLES CHEVRON TO DISCOVERY ......................................... 16

    A. The Subpoena Sought Is Reasonably Calculated to Lead to the Discovery of Evidence Relevant to and For Use in Foreign Proceedings ................................. 16

    B. The Application Meets All of Section 1782's Statutory Standards Are Met and Section 1782's Discretionary Factors All Favor Discovery ......................... 17

    C. None of the Evidence Sought Here Is Privileged ................................................. 20

        1. The Evidence at Issue Itself Constitutes Discoverable "Testimony" ....... 20

        2. Any Arguable Privileges Here Were Waived Through Disclosure ......... 21

        3. No Supposed Ecuadorian "Privilege" Exists Here ................................. 22

        4. The Crime-Fraud Exception Vitiates Any Potentially Applicable Privileges. ................................................................................................ 23

IV. CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

## Cases

Am. S.S. Owners Mut. Prot. & Indem. v. Alcoa S.S. Co.,
  2006 WL 212376 (S.D.N.Y. Jan. 26, 2006)......................................................22

Aniero Concrete Co. v. N.Y. City Sch. Constr. Auth.,
  2002 WL 257685 (S.D.N.Y. Feb. 22, 2002)....................................................22

Dura Auto. Sys. of Ind., Inc. v. CTS Corp.,
  285 F.3d 609 (7th Cir. 2002).........................................................................22

Edgar v. K.L.,
  93 F.3d 256 (7th Cir. 1996)...........................................................................17

Euromepa S.A. v. R.. Esmerian, Inc.,
  51 F.3d 1095 (2d Cir. 1996)..........................................................................18

Hatch v. Ooms,
  69 F. Supp. 788 (D.D.C. 1947)......................................................................25

Hazel-Atlas Glass Co. v. Hartford-Empire Co.,
  322 U.S. 238 (1944)................................................................................24, 25

Herman v. Marine Midland Bank,
  207 F.R.D. 26 (W.D.N.Y. 2002)....................................................................22

In re Applic. for an Order Permitting Metallgesellschaft AG to Take Discovery,
  121 F.3d 77 (2d Cir. 1997)............................................................................22

In re Applic. of Chevron Corp.,
  -- F. Supp. 2d --, 2010 WL 1801526
  (S.D.N.Y. May 10, 2010)...........................................................1, 6, 7, 17, 18

In re Applic. of Chevron Corp.,
  2010 U.S. Dist. LEXIS 51578 (S.D.N.Y. May 20, 2010)..................................5

In re Applic. of Chevron Corp.,
  2010 WL 2038826 (S.D. Tex. May 20, 2010)...........................................20, 21

In re Bayer AG,
  146 F.3d 188 (3d Cir. 1998)..........................................................................16

In re Campania Chilena de Navegacion,
  2004 WL 1084243 (E.D.N.Y. Feb. 6, 2004)..................................................18

In re Cnty. of Erie,
  473 F.3d 413 (2d Cir. 2007)..........................................................................21

In re Grand Jury Subpoena Duces Tecum,
  731 F.2d 1032 (2d Cir. 1984)........................................................................23

# TABLE OF AUTHORITIES
## (cont.)

Page(s)

*In re Hyman*,
502 F.3d 61 (2d Cir. 2007).................................................................... 19

*In re Ishihara Chem. Co.*,
121 F. Supp. 2d 209 (E.D.N.Y. 2000)...................................................... 5

*In re John Doe, Inc.*,
13 F.3d 633 (2d Cir. 1994)..................................................................... 24

*In re Noboa*,
1995 WL 581713 (S.D.N.Y. Oct. 4, 1995) .............................................. 18

*In re Oxus Gold PLC*,
2007 WL 1037387 (D.N.J. Apr. 2, 2007) ................................................ 18

*In re Sealed Case*,
754 F.2d 395 (D.C. Cir. 1985) ............................................................... 24

*Intel v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004)......................................................................... 18, 19

*Minatec Fin. S.A.R.L. v. SI Group Inc.*,
2008 WL 3884374 (N.D.N.Y. Aug. 18, 2008) ......................................... 19

*Republic of Ecuador v. ChevronTexaco Corp.*,
376 F. Supp. 2d 334 (S.D.N.Y. 2005)....................................................... 6

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,
257 F.R.D. 607 (E.D. Cal. 2009) ........................................................... 20

*Strougo v. BEA Assocs.*,
199 F.R.D. 515 (S.D.N.Y. 2001) ........................................................... 20

*Ukrnafta v. Carpatsky Petroleum Corp.*,
2009 WL 2877156 (D. Conn. Aug. 27, 2009) ......................................... 18

*United States v. Ackert*,
169 F.3d 136 (2d Cir. 1999).................................................................. 20

*United States v. City of Torrance*,
163 F.R.D. 590 (C.D. Cal. 1995) ........................................................... 21

*United States v. Hooker Chems. & Plastics Corp.*,
112 F.R.D. 333 (W.D.N.Y. 1986).......................................................... 20

## Statutes

28 U.S.C. § 1782 .................................................... 1, 3, 5, 7, 16, 17, 18, 19, 22, 25

# TABLE OF AUTHORITIES
## (cont.)

Page(s)

**Rules**

Fed. R. Civ. P. 26 ............................................................................................ 20, 21, 22

# I.  INTRODUCTION

28 U.S.C. § 1782 authorizes "[t]he district court of the district in which a person resides or is found [to] order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . ." New York attorney Steven Donziger, a resident of this district, is at the center of a $27.3 billion fraud. He is in possession of information that is relevant to three foreign or international proceedings, and is thus the proper subject of discovery pursuant to this § 1782 application seeking this Court's authorization of a subpoena for documents and a deposition.

As a result of a recent, related § 1782 order issued by Judge Kaplan of this Court,[1] as affirmed and modified by the Second Circuit, Applicant Chevron Corporation ("Chevron") obtained outtakes from the movie *Crude* that show Donziger orchestrating corruption, with the goal of obtaining a fraudulent multi-billion dollar judgment against Chevron in the case of *Maria Aguinda y Otros v. Chevron*, pending in Lago Agrio, Ecuador (the "Lago Agrio Litigation"). In that case, Donziger and his associates have sued Chevron, purportedly on behalf of a group of 48 Ecuadorians (the "Plaintiffs"), for alleged environmental damage in the Oriente region of Ecuador, despite the fact that the Ecuadorian state-owned oil company has *for twenty years* been the exclusive operator of the oil fields and there is no evidence that Chevron is responsible for any environmental damage. On camera, Donziger explains his litigation philosophy to a consultant who is reluctant to claim groundwater contamination when the sampling proves otherwise:

> *Hold on a second, you know, this is Ecuador . . . . You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want. Sorry, but it's true.*

---

[1] *In re Applic. of Chevron Corp.* ("*Berlinger I*"), -- F. Supp. 2d --, 2010 WL 1801526, at *1 (S.D.N.Y. May 10, 2010) (authorizing subpoena for *Crude* "outtakes").

Hendricks Decl., Ex. A at 195-05-01.

> ***Because at the end of the day, this is all for the Court just a bunch of smoke
> and mirrors and bullshit. It really is. We have enough, to get money, to win.***

*Id.*[2] The *Crude* footage also shows Donziger, his Ecuadorian associates, and U.S. consultants

secretly meeting with the Ecuadorian court's "Special Master" Richard Stalin Cabrera Vega

("Cabrera")—two weeks *before* Cabrera's appointment by the Ecuadorian court—in an elaborate

session with PowerPoint, planning out in detail the "global damages assessment" that Cabrera

would later submit to the court as his purportedly "neutral" and "independent" report recom-

mending tens of billions in bogus damages against Chevron.

The report of the Ecuadorian court's supposedly "neutral," "independent," and "impar-

tial" "Special Master" has been the centerpiece of Donziger's scheme to corrupt the Lago Agrio

Litigation. The Special Master's report ultimately recommended a $27.3 billion "global assess-

ment" against Chevron by accepting virtually every damages proposition offered by Plaintiffs

and rejecting or ignoring the extensive contrary evidence offered by Chevron. As the *Crude* out-

takes capture, and as the evidence that has emerged through the related § 1782 applications

proves, this official "global assessment" in the Lago Agrio Litigation is anything but neutral—

nor was it prepared while Cabrera maintained "strict independence with regard to the parties" or

the "transparen[cy]" mandated by the Ecuadorian court. Rather, it is the product of extensive

collusion between Donziger and Plaintiffs' other agents and Cabrera's official team. Chevron's

evidence and arguments were not weighed by an "independent," "impartial," "neutral," or

"transparent" "special master," but rather by Plaintiffs' counsel and agents working clandestinely

---

[2] References to the Hendricks Decl. are to the Declaration of Kristen L. Hendricks filed con-
currently. References to the Cabrera RJN are to the Request for Judicial Notice of Court Fil-
ings and Orders in the Lago Agrio Litigation and of Provisions of Ecuadorian Law. Refer-
ences to the U.S. Filings RJN are to the Request for Judicial Notice of U.S. Filings.

with Cabrera—an egregious corruption of the Lago Agrio Litigation. At their secret meeting just before the "Special Master" was officially appointed, Plaintiffs' lead Ecuadorian counsel, Pablo Fajardo, told the assembled group that Cabrera would "sign the report and review it. But all of us . . . have to contribute to that report." Hendricks Decl., ¶ 18. One of Plaintiffs' U.S.-based consultants, Ann Maest, then responds, tellingly: "But not Chevron." *Id.* The crowd laughs. *Id.*

The dramatic evidence of Donziger's campaign to defraud Chevron that is coming to light as a result of Judge Kaplan's issuance of a subpoena under § 1782 in turn supports the present application for a subpoena directed to Donziger, to assist Chevron in gathering evidence for use in the Lago Agrio Litigation and in the international arbitration that Chevron initiated against the Republic of Ecuador ("Ecuador") under the Bilateral Investment Treaty between the United States and Ecuador (the "Treaty Arbitration"). Chevron has filed a number of § 1782 petitions seeking evidence of this fraud, all of which have been granted by the seven federal District Courts to have considered them.[3] These related § 1782 petitions have also revealed that Donziger's and Plaintiffs' specific collusion with Cabrera was not the beginning of the fraudulent enterprise in Lago Agrio, but rather the continuation of a scheme that has continued for

---

[3] *See Berlinger I*, *1; U.S. Filings RJN, Ex. B, 9-12 (*In re Applic. of Chevron Corp.*, No. 1:10-mi-00076-TWT-GGB, Order (N.D. Ga. Mar. 2, 2010) (authorizing deposition and document discovery of Charles Calmbacher)); *id*, Ex. D, 8 (*Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv00047-JLK, Trans. (D. Colo. Mar. 4, 2010) (authorizing subpoenas to issue for depositions and documents from Plaintiffs' environmental consultants Stratus Consulting)); *id.*, Ex. E (*In re Applic. of Chevron Corp. v. 3TM Consulting, LLC*, No. 4:10-mc-134, Order (S.D. Tex. Apr. 5, 2010) (granting discovery of Plaintiffs' consultants 3TM Consulting)); *id.*, Ex. I, 47 (*In re Applic. of Chevron Corp.*, No. 2:10-cv-02675-SRC-MAS, Trans. (D. N.J. Jun. 11, 2010) (authorizing subpoenas for depositions and documents from Plaintiffs' consultant UBR)); *id.*, Ex. O (*In re Applic. of Chevron Corp.*, No. 1:10-mc-00371-CKK, Order (D. D.C. July 22, 2010) (authorizing subpoena for deposition and documents from Plaintiffs' former Ecuadorian attorney, Alberto Wray)); Hendricks Decl., Ex. QQ (*In re Applic. of Chevron Corp.*, No. 10-cv-1146-IEG (WMc), Order (C.D. Cal. Jun. 23, 2010)); *id.*, ¶ 67 (court authorizing subpoenas to issue for depositions and documents from E-Tech)).

years. Discovery conducted pursuant to Chevron's § 1782 proceedings in Georgia, for example, has shown that even before Plaintiffs arranged the staged appointment of Cabrera as the Ecuadorian court's "Special Master," Plaintiffs, under Donziger's direction, submitted false expert reports to the Ecuadorian court—replete with false damage claims—and otherwise tampered with evidence as soon as the case was under way. *See, e.g.*, Hendricks Decl., Ex. DD, 116:9-10, 117:16-20.

In short, the scheme to extort Chevron through the Lago Agrio Litigation has been ongoing since that litigation's inception. The scheme has involved collusion with Ecuadorian government officials to pass legislation seeking to impose liability upon Chevron retroactively and even in the absence of any actual harm to any person or property, and to advance their fraudulent civil claims with sham criminal charges against two Chevron attorneys in Ecuador. Donziger has promoted the Lago Agrio Litigation as a cause célèbre, and has used the notoriety it has gained to appear before, and make misrepresentations to, the U.S. Congress and the media. *See* U.S. Filings RJN, Ex. S, 18-19.[4]

In this proceeding, as in the related § 1782 proceedings, much of the evidence sought involves interactions and communications with an auxiliary of the court (Cabrera) and his team, Plaintiffs' testifying experts, the Ecuadorian court, the Ecuadorian government, and other third parties, and thus cannot conceivably be shielded by any privilege. Indeed, the Second Circuit recently ordered that all such communications caught on film be produced. U.S. Filings RJN, Ex. N. And all the evidence sought here involves Donziger's role in a crime/fraud currently be-

---

[4] For examples of these and other misrepresentations, Chevron refers the Court to the Memorandum of Law Chevron submitted on August 3, 2010, in support of a Motion for a Preservation Order in the § 1782 proceeding already pending before Judge Kaplan. *See* U.S. Filings RJN, Ex. S, at 18-19 (describing Donziger's testimony before the congressional Tom Lantos Human Rights Commission concerning the "independent" report by Cabrera).

ing perpetrated. Given the enormity of the wrongdoing proven by the current record, this Court should join the District of New Jersey which, in granting § 1782 discovery from one of Plaintiffs' undisclosed consultants who was a member of Cabrera's supposedly "independent" team, found *prima facie* evidence of fraud in rejecting asserted privilege claims. U.S. Filings RJN, Ex. I, 41-41.

> Chevron's need for the evidence it seeks here is urgent, as this Court has recognized:

>> The Lago Agrio Plaintiffs are pushing the Ecuadorian court to close the evidentiary phase of that litigation and immediately enter a multibillion dollar judgment against Chevron, thus preventing Chevron from placing before that court the likely relevant evidence contained in the [discovery sought]. Those plaintiffs intend, if they succeed, to attempt to enforce such a judgment around the world.

*In re Applic. of Chevron Corp.* ("*Berlinger II*"), 2010 U.S. Dist. LEXIS 51578, at *29 (S.D.N.Y. May 20, 2010). Accordingly, Chevron requests that this Court grant this application pursuant to 28 U.S.C. § 1782 to issue a subpoena to Donziger, requiring him to produce documents and provide deposition testimony bearing on the Lago Agrio Litigation, the related Treaty Arbitration, and the criminal proceedings. Given the urgency of this request, Chevron has filed this application *ex parte* and asks this Court to approve the application for a subpoena immediately or, in the alternative, enter an order to show cause setting an extremely abbreviated briefing schedule. *See*, *e.g.*, *In re Ishihara Chem. Co.*, 121 F. Supp. 2d 209, 210 n.1 (E.D.N.Y. 2000) (courts typically address § 1782 applications on an *ex parte* basis).[5] Moreover, given the nature of the fraud involving Donziger, Chevron also asks the Court to put in place whatever requirements, procedures, or protocols may be necessary to preserve the evidence Chevron seeks during the pendency of this Application.

---

[5] Chevron has submitted proposed orders granting this Application *ex parte*, or, in the alternative, granting an Order to Show Cause why the subpoena should not issue and ordering an accelerated briefing and hearing schedule.

## II. FACTUAL BACKGROUND

**A.** **TexPet's Participation in State-Controlled Oil Operations in Ecuador, the Passage of the Environmental Management Act, and the Filing of the Lago Agrio Litigation and Treaty Arbitration**

From 1965 to 1992, Texaco Petroleum Company ("TexPet") participated in an oil exploration and production consortium in the Oriente region of Ecuador. *See Republic of Ecuador v. ChevronTexaco Corp.* ("*ROE*"), 376 F. Supp. 2d 334, 339-40 (S.D.N.Y. 2005). Petroecuador, Ecuador's state-owned oil company, became a stakeholder in the consortium in 1973 and in 1977 became the 62.5% majority stakeholder. *Id.* at 340. From 1990 to the present, Petroecuador has been the *sole* operator, and from 1992 to the present, the *sole* owner, of exploration and production operations in the former concession area, *id.* at 340-41, amassing an abysmal environmental record. Hendricks Decl., Ex. EE, 6.

When the concession contract expired in 1992, TexPet negotiated a settlement agreement (the "1995 Agreement") with Ecuador and agreed to remediate certain of the consortium's oil exploration and production areas. *See ROE*, 376 F. Supp. 2d at 341-42; *Berlinger I*, *3; Hendricks Decl., Ex. FF. TexPet spent $40 million to complete its remediation under the monitoring and supervision of both Petroecuador, the Ecuadorian government and outside auditors and, pursuant to the 1995 Agreement and a 1998 release agreement (the "1998 Release"), was released "from all Government's and Petroecuador's claims against the Releases for Environmental Impact from the Operations of the Consortium[.]" *See Berlinger I*, *14; Hendricks Decl., Ex. FF, 3; *id.*, Ex. GG, 5-6. At this time, the Ecuadorian government was the only party that could vindicate or settle claims for generalized environmental damage. *Id.*, Ex. Y.

After TexPet's 1998 release, Plaintiffs' U.S. and Ecuadorian lawyers successfully sought enactment of a new law, which for the first time granted standing to *private parties* to seek compensation in Ecuador for generalized environmental damage—the same claims for damage that

Ecuador had already settled vis-à-vis TexPet. *See* Hendricks Decl., Ex. Z. The resulting law, the Environmental Management Act (EMA), was heralded by the legislature as "a historic step in Ecuadorian law." *Id.*, Ex. W. The EMA was presaged by 1996 amendments to the Constitution that were pointedly directed at establishing "liability for transnational enterprises and companies." *Id.*, Ex. V.

In 2003, the Lago Agrio Litigation was filed on behalf of 48 Ecuadorians against Chevron (but not Petroecuador). *Berlinger I*, *2. Plaintiffs' claims were premised not upon personal injury, but rather upon the diffuse environmental rights of all Ecuadorian citizens created by the EMA in 1999, for which TexPet had already been fully released in 1998. Still, Ecuador has provided its "full support" to Plaintiffs, Hendricks Decl., Ex. AA, and "announc[ed] that it would receive ninety percent of any recovery." *Berlinger I*, *6.

**B.      Plaintiffs Falsify Evidence in, Then Abandon, the "Judicial Inspections" of the Former Concession Area**

At the outset of the Lago Agrio Litigation, the Ecuadorian court ordered, through a process known as "judicial inspections," experts nominated by Plaintiffs and Chevron to jointly investigate and report on the environmental conditions at 122 former consortium oil production sites. Hendricks Decl., Ex. EE, ¶ 44. Plaintiffs selected Dr. Calmbacher as the "expert in charge of [their] inspections" and to act as their testifying expert for four sites. U.S. Filings RJN, Ex. B, 2; *see* Cabrera RJN, Ex. EE; *id.*, Ex. FF; *id.*, Ex. GG. On February 14 and March 8, 2005, judicial inspection reports were filed in Dr. Calmbacher's name for two of those sites, both purporting to show extensive environmental damage requiring millions of dollars to remediate. Cabrera RJN, Ex. HH; *id.*, Ex. II. Yet at a deposition pursuant to § 1782 in March 2010, Dr. Calmbacher testified that these reports were not authored by him and that their conclusions were fabricated:

I did not reach these conclusions and I did not write this report. (116:9-10)

7

Q. So the conclusions in the expert report for Shushufindi 48, Exhibit 13, to the extent they're presented to the Court as conclusions you reached, that presentation would be false, correct? A. Correct. (117:16-20)

Q. Did you ever find that any of the sites that you inspected required any further remediation? A. No." (113:23-25)

Q. While you were working as a judicial inspection expert for the plaintiffs, did you ever conclude that TexPet had failed to adequately remediate one of the sites? A. I didn't no. (115:15-19)

Hendricks Decl., Ex. DD.

Dr. Calmbacher produced documents showing Donziger's control over Plaintiffs' participation in the judicial inspection process and further testified that Donziger "exerted significant control over the plaintiffs' experts in the litigation," and "if the Ecuadorian lawyers had any question[s], they went to him." *Id.* at 24:20-25. Calmbacher confirmed that he had "discussed what [his] findings were on this site and others" with Donziger, and believes Donziger would have known that the expert reports were not authorized by Calmbacher. *Id.* at 118:15-119:1. And, despite his unwillingness to follow it, Donziger's direction to Calmbacher was clear, "he wanted the answer to be that there was contamination and people were being injured. . . . [b]ecause it makes money. That wins his case." *Id.* at 92:2-11.

Dr. Calmbacher also testified about the "Selva Viva Laboratory" noted as analyzing Judicial Inspection samples on Plaintiffs' chain of custody forms. *Id.*. at 132:11-133:19; 107:15-108:2. Yet there is no Selva Viva laboratory in Ecuador and, according to Dr. Calmbacher's testimony, "Selva Viva Laboratory" was in fact Plaintiffs' team's hotel room. Selva Viva is, however, a limited liability company founded in Ecuador in 2004 by Donziger and another Plaintiffs' lawyer, with Donziger as President. Hendricks Decl., Ex. BB.

The Ecuadorian court appointed a panel of "Settling Experts" to resolve any conflicts between the conclusions of the parties' experts based on their respective judicial inspections.

Hendricks Decl., Ex. EE, 10. The first—and only—time Settling Experts issued a report was in February 2006 at a site named Sacha 53, where they agreed with Chevron's experts' findings and concluded that TexPet's remediation met the standards agreed to with Ecuador and that there was no evidence of contamination that posed a risk to either human health or the environment. *Id.*, 11. Recognizing that the repeated rejection of their claims by the "Settling Experts" would likely end their case, Plaintiffs immediately embarked on a campaign to abandon the judicial inspections and stage a "global assessment" whereby Donziger's unsupported damage theories would be fed to and presented by a supposedly "Special Master." The Ecuadorian court appointed Cabrera as its "global" expert on March 19, 2007. Cabrera RJN, Ex. A, 2.

## C. Cabrera, His Team, and Collusion with Plaintiffs on the Cabrera Report

### 1. Cabrera and His Team and the "Cabrera" Report

The Ecuadorian court appointed Cabrera as "an *auxiliary* to the Court" and required that he "perform his duties . . . with complete *impartiality* and *independence* vis-à-vis the parties" and "observe and ensure . . . the impartiality of his work, and the transparency of his activities." Cabrera RJN, Ex. B (emphases added); *id.*, Ex. E, 12; *id.* 2, 4 ("[t]he transparency of the expert's work will be ensured, and the parties shall have access to that work . . . . reiterating that the work of the expert is governed by the principle of the court's actions being open to the public"). In November 2007, the Ecuadorian court explicitly ordered that "all the documents that serve as support or a source of information for the work performed by the Expert must be presented together with the report.... [I]n his report the Expert is required to cite all of the scientific sources, and analytical and legal documents that he uses to perform his work." *Id.*, Ex. J, 1.

The Cabrera Report, issued just 10 months after Cabrera's appointment, purported to find "serious and widespread contamination" in the former concession area and assessed damages against Chevron of more than $16 billion. Hendricks Decl., Ex. HH, 27. Apart from purporting

to analyze the results of Plaintiffs' Judicial Inspections sampling, the Cabrera Report did not cite the work product of either Plaintiffs or their consultants as a "source." Plaintiffs submitted "comments" purporting to criticize "the Expert's work and conclusions" as containing "omissions [that] are unjustly favorable to the defendant." Hendricks Decl., Ex. II. Cabrera then dramatically increased his damage estimate in response to Plaintiffs' comments and ultimately asserted damages for the purported environmental, social, and cultural impacts of the oil production consortium of nearly $19 billion, to which he added another $8.4 billion for "unlawful profits," for a total of $27.3 billion. Hendricks Decl., Ex. JJ, 53-54. Cabrera went well beyond his mandate, seeking "to achieve change in the overall economic, political and social paradigm to a new view of equality of entitlements, with economic solidarity that has as its ultimate goal benefiting the population as a whole instead of elitist profiteering . . . ." *Id.*, 16.

### 2. Cabrera and Plaintiffs' Undeniable Collusion.

Though Cabrera was not appointed by the Ecuadorian court until March 19, 2007, Chevron has now obtained footage of Plaintiffs' counsel meeting *with Cabrera* to plan his expert report, *two weeks earlier, on March 3, 2007*.[6] *See* Hendricks Decl., Ex. A, 187-01-02-01, 189-00-01, 189-00-02, 189-00-03, 191-00-01, 191-00-02, 192-00-01; Hendricks Decl. at ¶ 7. Cabrera is shown on camera on several occasions during this March 3rd meeting, though the camera appears to intentionally avoid filming him for the majority of the time. *Id.*, 187-01-02-01, 189-00-01, 191-00-01. The day following the meeting, one participant acknowledged his awareness of its impropriety, characterizing Cabrera's presence as "bizarre." *Id.*, 196-00-01.

---

[6] For additional details of this meeting and other video evidence of collusion, Chevron refers the Court to the Memorandum of Law Chevron submitted to the Southern District of New York on August 3, 2010, in support of a Motion for a Preservation Order in the § 1782 proceeding already pending before Judge Kaplan. *See* U.S. Filings RJN, Ex. S, at 5-13.

In the morning session of the March 3rd meeting, Plaintiffs' counsel Pablo Fajardo presents a PowerPoint outlining the "*Plan Para Examen Pericial Global*," or Plan for the Global Expert Assessment and discusses that plan. Hendricks Decl., Ex. A, 187-01-02-12. Fajardo emphasizes that everyone needs to contribute to the report, explaining: "And here is where we do want the support of our entire technical team . . . of experts, scientists, attorneys, political scientists, so that all will contribute to that report—in other words—you see . . . *the work isn't going to be the expert's. All of us bear the burden*." Hendricks Decl., Ex. A, 191-00-03. One of the translators asks whether the final report is going to be prepared only by the expert. Fajardo responds that the expert will "sign the report and review it. But all of us . . . have to contribute to that report." *Id.* Plaintiffs' consultant Ann Maest asks, "Together?" and Fajardo confirms. Maest then states, "But not Chevron," to which everyone laughs. *Id.*

In the afternoon session, the group discuss the "work plan," the first document that Cabrera would be required to sign and file with the Ecuadorian court. *Id.*, 189-00-02. Donziger proposes that he and the U.S.-based consultants form a "work committee" to present a "draft plan," with a goal of having "more or less eighty percent—ninety percent on the way to a plan" in a few days. *Id.* Looking at Cabrera, Donziger then says, "and Richard, of course you really have to be comfortable with all that. And we'll also def—define the support the expert needs." *Id.* The recording of the meeting ends with Donziger commenting, "We could jack this thing up to $30 billion in one day." *Id.* at 193-00-01.

In footage taken the next day (March 4, 2007), Donziger is shown brushing off issues raised by Plaintiffs' U.S. environmental consultants. Hendricks Decl., Ex. A, 198-00-01. One of the consultants says, "I know we have to be totally transparent with Chevron in showing them what we're doing." Donziger answers, "No, no," and says, "Because they will find out every-

thing we do." He goes on to explain that "[o]ur goal is that they don't know shit . . . and that's why they're so panicked." *Id.*, 196-00-01. During the same lunch, the consultants tell Donziger there is no evidence contamination from the pits has spread into the surrounding groundwater. Donziger responds, saying, "You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want" and "[t]herefore, if we take our existing evidence on groundwater contamination, which admittedly is right below the source . . . [a]nd wanted to extrapolate based on nothing other than our, um, theory," then "[w]e can do it. And we can get money for it." *Id.* at 195-05-01. He goes on, "[T]his is all for the Court just a bunch of smoke and mirrors and bullshit." *Id.* When one consultant argues that "there is not enough information on that groundwater" and that "the one hole in the remediation, is the water," Donziger ultimately breaks off the discussion, stating, "There's another point I got to make . . . with these guys, but I can't get this on camera," and the footage ends. *Id.*

Shortly after the March 3rd and 4th meetings, Donziger meets with and retains Stratus Consulting (based in Denver, Colorado) to prepare the global assessment. *Id.*, 269-00-01 (footage in which Donziger says Stratus will be hired to prepare a "damages claim," and then discusses several "categories" of damages that are later made part of Cabrera Report). A privilege log of Stratus documents, recently produced by Plaintiffs in a related § 1782 proceeding, indicates that Donziger was integrally involved in the ghostwriting of the Cabrera Report. Hendricsk Decl., Ex. J The privilege log and other evidence also indicates that Plaintiffs' U.S.-based consultants wrote significant portions of the Cabrera Report and its Annexes at Donziger's direction. *See, e.g., id.*, 129.

Donziger also had Stratus issue public comments endorsing the methodologies and conclusions in the Cabrera Report, without disclosing that Stratus was the true author of much of the

report on which they purport to be objectively commenting. Hendricks Decl., Ex. KK. Like so much of the supposedly "neutral" Cabrera Report, the Stratus Comments seek to deceive the reader into believing that they reflect the opinions of a neutral and unbiased third party on the "independent" Cabrera Report:

> We have reviewed the report "Informe Sumario del Examen Pericial" *that was prepared by Ing. Richard Cabrera Vega*, who was appointed as a technical expert by the Court in the case of María Aguinda y Otros against Chevron Corporation (Cabrera, 2008). … *Mr. Cabrera is thus acting in the capacity of a neutral "expert" to the Court*, and his role is to assist the Court in evaluating the scientific and technical information that was collected and compiled for the case. *In the U.S. Court system, Mr. Cabrera would be called a Technical Special Master.* We reviewed *the overall approach that Mr. Cabrera used* to assess the damages caused by Texpet's operations, and we reviewed the specific methods that he used to conduct his assessment. *Based on our review, we conclude that the overall approach used by Mr. Cabrera* is sound, reasonable, and consistent with approaches used in other environmental damage cases around the world.

*See id.*, 1 (emphasis added). Plaintiffs' press release concerning the release of the Stratus Comments refers falsely to Stratus principals hired by Donziger as a "Team of Independent Scientists" who have worked "under the auspices of the U.S. Department of Justice," and whose objective endorsement "[c]onfirmed" Cabrera's findings. *See* http://chevrontoxico.com/news-and-multimedia/2008/1201-chevrons-27-billion-liability-in-ecuadors-amazon-confirmed.html.

### 3. Plaintiffs' and Donziger's Denials and Misrepresentations of Their Relationship with Cabrera

The collusion between Plaintiffs and Cabrera and his team stands in stark contrast with both Plaintiffs' and Cabrera's staunch denials. Cabrera testified repeatedly in Ecuador that all his work was performed independently, impartially transparently, and exclusively by him and his independent expert team: "*All the work was planned, directed, and approved by me*, as the person responsible for the expert examination." Hendricks Decl., Ex. HH (emphasis added). Cabrera also testified: "I should clarify that *I do not have any relation or agreements with the plaintiff*, and it seems to me to be an insult against me that I should be linked with the attorneys of the

plaintiffs." Cabrera RJN, Ex. D (emphasis added). Indeed, Cabrera testified unequivocally:

> *The defendant's attorneys allege* that the plaintiff is in 'close contact' with me, and *that the plaintiff has provided me with technical information* and support staff to assist with the expert examination. *This is untrue.* If I need any technical information in connection with this case, all I have to do is request it from this Court; *the idea that the plaintiffs would be helping me with that is unthinkable.... Worse still is the accusation of [Chevron's] attorneys that the conduct of the other technicians is a "decoy," a ploy to conceal preexisting information provided by the plaintiff that I allegedly will simply attach to my expert report.* I condemn this assertion because it has no basis and there is no evidence to support it[.]

Cabrera RJN, Ex. F, 3 (emphasis added).

Plaintiffs and their U.S.-based consultants also deny or misrepresent their relationship with Cabrera in the § 1782 proceedings pending across the U.S. *See, e.g.,* U.S. Filings RJN, Ex. F, 2-3; *id.*, Ex. S, 13-18 (describing various misrepresentations by Plaintiffs' counsel before the Ecuadorian court, United States courts, the United States Congress, and federal regulators).

**D.      Donziger's Collusion with the Ecuadorian Government and the Pursuit of False Criminal Charges Against Chevron's Attorneys**

Donziger's associates have publicly claimed influence over the passage of Ecuador's 1999 EMA and otherwise rewriting Ecuador's laws and Constitution in an attempt to further the Lago Agrio Litigation. Hendricks Decl., Ex. EE, 7. They have sought to revive for private citizens the claims that Ecuador's national, provincial and municipal governments previously settled, to evade the effects of those prior settlements, and to create *ex post facto* liability, all for the purpose of creating a veneer of legitimacy for a judgment against Chevron, 90% of which the Ecuador's Prosecutor General has said will go directly to Ecuador. *Id.*, Ex. PP.

The *Crude* outtakes show Donziger admitting to Plaintiffs' strategy of getting Ecuador's Prosecutor General to prosecute two of Chevron's attorneys. Hendricks Decl., Ex. A, 198-00. And Donziger crows that the time might be right to "call for the head of Chevron lawyer Rodrigo Perez Pallares." Hendricks Decl., Ex. A, 268-00. In response, Ecuador's Office of the Public

Prosecutor has brought sham "criminal actions" against Pallares and another Chevron lawyer, Ricardo Reis Veiga, that are now pending. U.S. Filings RJN, Ex. H. Donziger's associates also conspired to procure the initiation of sham criminal prosecutions: in an email exchange among representatives of the Plaintiffs and the Attorney General's office, one of the Plaintiffs' lead lawyers wrote, "if at some point we want the Government and the Attorney General to play for our side, we must give them some ability to maneuver." Hendricks Decl., Ex. OO. Martha Escobar, a deputy of the Attorney General responded that both the office and "all of us working on the State's defense were searching for a way to nullify or undermine the value of the remedia-tion contract and the final acta [i.e., the 1998 Release] . . ." *Id.* And Donziger's puppetry of the supposedly "independent" expert Cabrera also focused on supporting these sham criminal prose-cutions. Specifically, at the March 3rd meeting, Donziger discussed the importance of handling the remediation in the Cabrera Report "in a special manner" to support criminal charges against Chevron's lawyers. Hendricks Decl., Ex. A, 188-01-03.

## E.    Obstruction of Discovery in Related 1782 Proceedings

Corresponding to the ongoing fraud in Ecuador is a coordinated strategy by Donziger and Plaintiffs in U.S. courts to obstruct and block discovery. Before District Courts in California, Texas, Colorado, New Jersey, Washington D.C., and Tennessee, and the Second, Third, and Fifth Circuit courts, Plaintiffs have claimed that Cabrera was independent and have disclaimed collusion in the Cabrera Report. *See* U.S. Filings RJN, Ex. S, at 15-18. Plaintiffs urged those courts to deny discovery, assuring them that their interactions with Cabrera were proper and that Chevron is "manufactur[ing] a 'scandal.' *Id.*, Ex. Q, at 11. They have even gone as to call the discovery "shameful" "gamesmanship" and to imply it is motivated by racism. *Id.*, Ex. L, at 2. Donziger and Plaintiffs have even sought to discourage witnesses from testifying and to improp-erly seal documents evidencing their collusion, such as a Plaintiff-created database that appeared,

without attribution, in the Cabrera Report.  Hendricks Decl., Ex. LL-MM.

### III.     SECTION 1782 ENTITLES CHEVRON TO DISCOVERY

This Application easily meets all of § 1782's statutory and discretionary standards, and there is no merit to any assertion of privilege.

### A.     The Subpoena Sought Is Reasonably Calculated to Lead to the Discovery of Evidence Relevant to and For Use in Foreign Proceedings

Chevron's proposed subpoena to Donziger is reasonably calculated to lead to the discovery of evidence relevant to the Lago Agrio Litigation, the Treaty Arbitration, and the related criminal proceedings.  This evidence therefore is "presumptively discoverable" under § 1782.  *In re Bayer AG*, 146 F.3d 188, 196 (3d Cir. 1998).  The proposed discovery seeks a deposition and documents relating to the corruption of the Lago Agrio Litigation and attempts to undermine the settlement and release agreements, including efforts to prompt the filing of false criminal charges against Chevron lawyers, all as part of an overarching scheme to defraud Chevron.  This includes documents relating to communications and collusion among Plaintiffs; Cabrera; Plaintiffs' U.S. and Ecuadorian experts, including those relating to the Judicial Inspections; Ecuadorian officials; allied organizations like Amazon Watch and the Frente.  It also includes discovery relating to the efforts to conceal Plaintiffs' misconduct and deceit of the public and the United States courts.

Donziger has played a critical role in managing Plaintiffs' shadow experts in the Lago Agrio Litigation, orchestrating the fraudulent collusion between Plaintiffs (and their representatives and consultants), Cabrera (and his team), and other officials of the Ecuadorian government, placing himself at the center of the issues on which discovery is sought.  In particular, Donziger oversaw the creation and filing of falsified expert reports at the outset of the judicial inspection process in Lago Agrio, and he orchestrated and facilitated the ghostwriting of the fraudulent $27.3 billion Cabrera Report, and he and U.S.-based consultants he hired had improper *ex parte*

contacts with both Cabrera and multiple members of his team. The repeated and demonstrably false assertions regarding these contacts and actions that Donziger has prompted Plaintiffs' representatives and consultants to make before the United States District Courts and Courts of Appeals are also highly relevant, as they show a pattern and practice of intentional distortion of judicial processes, and an awareness that their actual conduct in Lago Agrio was grossly improper and unlawful.

As Judge Kaplan explained in granting a related § 1782 application, "[a]ny interaction between plaintiffs' counsel and a supposedly neutral expert in the Lago Agrio Litigation would be relevant to whether the expert is independent and his damages assessment reliable." *Berlinger I*, *10. Whether Cabrera's work is compromised or tainted by Plaintiffs' influence or whether it is in fact Cabrera's work at all are significant and relevant issues disputed in the foreign proceedings, as is whether Plaintiffs' judicial inspection reports and sampling were falsified. *See, e.g., Edgar v. K.L.*, 93 F.3d 256, 261-62 (7th Cir. 1996). So, too, is evidence of the broader collusion that Donziger and Plaintiffs' other representatives have engineered with Ecuadorian government officials to nullify the final release previously agreed to by the Government of Ecuador, to issue sham indictments against Chevron attorneys, and to pressure that country's courts to enter a groundless multi-billion-dollar award.

**B.     The Application Meets All of Section 1782's Statutory Standards Are Met and Section 1782's Discretionary Factors All Favor Discovery**

All of § 1782's statutory requirements are satisfied. Donziger practices law and resides in Manhattan, and thus he is "found" in this District. *See* Hendricks Decl., Ex. NN. The discovery Chevron seeks is for use in proceedings before foreign tribunals: the Lago Agrio Litigation and the Treaty Arbitration. As the defendant in the Lago Agrio Litigation and one of the parties in the Treaty Arbitration, Chevron qualifies as an "interested person." *Berlinger I*, *6.

Each of the four factors guiding this Court's discretion under § 1782 also favors discovery here: (1) whether the person from whom discovery is sought is a party in the foreign proceeding; (2) the receptivity of the foreign tribunal to federal-court assistance; (3) whether the request conceals an attempt to circumvent foreign proof-gathering restrictions; and, (4) whether the request is unduly intrusive or burdensome. *See Intel v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-65 (2004).

The first factor favors discovery because Donziger is not a party to (nor even counsel of record in) either the Lago Agrio Litigation or the Treaty Arbitration. *Id.* at 264; *Berlinger I*, *6.

With regard to the second factor, receptivity, § 1782 previously has been applied to authorize discovery for matters pending in Ecuadorian courts, including the Lago Agrio Litigation itself. *See, e.g., Berlinger I*, at *22; *In re Campania Chilena de Navegacion*, 2004 WL 1084243, at *5 (E.D.N.Y. Feb. 6, 2004) (ordering depositions and production of evidence to assist in the Ecuadorian proceeding); *In re Noboa*, 1995 WL 581713, at *3 (S.D.N.Y. Oct. 4, 1995) (ordering depositions to assist in Ecuadorian probate proceeding). The application of § 1782 in public investment arbitrations like the Treaty Arbitration similarly is well established.[7] *See, e.g., In re Oxus Gold PLC*, 2007 WL 1037387, at *5 (D.N.J. Apr. 2, 2007); *Ukrnafta v. Carpatsky Petroleum Corp.*, 2009 WL 2877156, at *4 (D. Conn. Aug. 27, 2009).[8]

---

[7] The Treaty Arbitration is pending before a United Nations Commission on International Law (UNCITRAL) *tribunal*. Hendricks Decl., Ex. EE, 54.

[8] In an effort to prevent discovery, Plaintiffs have petitioned the Ecuadorian court (but not the Treaty Arbitration tribunal) to "order" itself unreceptive to evidence from all § 1782 proceedings in the United States. Cabrera RJN, Ex. DD, 3. The Ecuadorian court has not yet responded to Plaintiffs' request, nor would any such statement by that court be dispositive. Even if it could later be "authoritatively pro[ven]," *Euromepa S.A. v. R.. Esmerian, Inc.*, 51 F.3d 1095, 1099-1100 (2d Cir. 1996), that either foreign tribunal is unreceptive to the truth emerging in all these § 1782 proceedings, the Supreme Court made clear in *Intel* that § 1782

[Footnote continued on next page]

Third, this application is not an attempt to circumvent foreign proof-gathering restrictions. The Supreme Court has made clear that this factor does *not* turn on whether the evidence sought could be discovered in the foreign tribunal. *Intel,* 542 U.S. at 253 ("We now hold that § 1782(a) does not impose ... a [foreign-discoverability] requirement."). Rather, this factor inquires only into whether the discovery is being sought in bad faith, which, given the extensive evidence of Donziger's improper conduct, it is not. *Minatec Fin. S.A.R.L. v. SI Group Inc.*, 2008 WL 3884374, at *8 (N.D.N.Y. Aug. 18, 2008). Other District courts already have found that Chevron is acting in "good faith" in making similar applications for discovery of materials related to the fraud at issue here. U.S. Filings RJN, Ex. D, 6; *id.*, Ex. E, 2.[9]

Finally, any burden associated with Chevron's discovery is outweighed by the illicit conduct in the Lago Agrio Litigation orchestrated by a resident of this District. This Application seeks evidence of fraud regarding Plaintiffs' original judicial inspections, fraud regarding court expert Cabrera, and collusion between Donziger and Plaintiffs' agents and partners, on the one hand, and Ecuador, on the other. Given Donziger's central role in these arenas, each of these categories of discovery is reasonably calculated to obtain evidence of Plaintiffs' activities in furtherance of this fraud. Any "burden" on Donziger of divulging his fraud is outweighed by the need to unravel the corruption associated with the Lago Agrio Litigation. And Chevron believes that any burden should be minimal because the documents requested are typically maintained by attorneys in the ordinary course of business.

---

[Footnote continued from previous page]
discovery may be appropriate even where the foreign tribunal states "that it does not need or want the District Court's assistance." 542 U.S. at 265.

[9] Plaintiffs are bound by those prior findings and rulings against them, under basic principles of collateral estoppel. *See, e.g., In re Hyman*, 502 F.3d 61, 65-66 (2d Cir. 2007).

## C.   None of the Evidence Sought Here Is Privileged

Any claim of "privilege" by Plaintiffs or Donziger is baseless and every other court that has thus far considered such claims has rejected them. As an initial matter, no communications with third parties—such as communications between Donziger and Ecuadorian officials or the Ecuadorian court, or communications in the presence of the *Crude* film crew or Cabrera—can even arguably be considered privileged. *See, e.g., United States v. Ackert,* 169 F.3d 136, 139 (2d Cir. 1999); *Strougo v. BEA Assocs.,* 199 F.R.D. 515, 625 (S.D.N.Y. 2001). In fact, Judge Kaplan and the Second Circuit have already ruled that Donziger's communications with a wide variety of individuals captured on film are not privileged, and the District Court in New Jersey has expressly found that, in addition to the failure of other legitimate bases for privilege, communications with Plaintiffs' consultants and other participants in the fraudulent conduct are also not privileged under the crime-fraud exception.

### 1.   The Evidence at Issue Itself Constitutes Discoverable "Testimony"

Much of the evidence sought here—including undisclosed, *ex parte* communications and documents Donziger helped pass from Plaintiffs' U.S.-based consultants to court-expert Cabrera and his team for use in the Cabrera Report—qualifies as "*testimony*" and is thus non-privileged and discoverable, as the District of New Jersey and the Southern District of Texas have concluded. U.S. Filings RJN, Ex. I, 42-43; *In re Applic. of Chevron Corp.* ("*3TM*"), 2010 WL 2038826, at *10 (S.D. Tex. May 20, 2010); *see also* Fed. R. Civ. P. 26(b)(4). This broad rule of discovery applies not only to the work of Plaintiffs' consulting experts that was provided to Cabrera, but also to their work *in toto*. Where, as here, Plaintiffs' U.S.-based consulting "expert[s] ha[ve] 'entered the judicial arena'" by submitting testimony to the court (in Ecuador) and becoming testifying experts themselves, all their work becomes discoverable. *S. Yuba River Citizens League,* 257 F.R.D. 607, 611 (E.D. Cal. 2009); *see also, e.g., Hooker Chems. & Plastics*

*Corp.*, 112 F.R.D. at 339. Moreover, even if Plaintiffs could demonstrate that some of the materials sought by Chevron are subject to the work product doctrine, which they cannot, such materials are discoverable where, as here, Chevron has shown the relevance of such materials and a "substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii).

## 2. Any Arguable Privileges Here Were Waived Through Disclosure

Even if the ghostwritten portions of the Cabrera Report or other material from Plaintiffs' U.S.-based consultants sought here (along with other evidence of Donziger's corruption of the judicial process) did not itself constitute discoverable testimony (which it does), any arguable privileges were *waived* with respect to such materials when they were disclosed to Cabrera, in his capacity as at least a testifying expert (if not also a "Special Master" and "auxiliary" to the Ecuadorian court), or other third parties. Plaintiffs' assertions of privilege have been rejected by at least two federal district courts based on such waiver. *See 3TM*, *3-4; U.S. Filings RJN, Ex. O, 43 (UBR Transcript). As the Southern District of Texas held, "as soon as [Plaintiffs' consultant's] report was given to the court, or at least an auxiliary of the court, to be used in preparing Cabrera's expert report that shield [of the non-testifying expert privilege] was lost. *3TM*, *3.

"When counsel forwards documents prepared by a non-testifying consultant to a testifying expert, they become discoverable." *United States v. City of Torrance*, 163 F.R.D. 590, 593 (C.D. Cal. 1995). [10] Here Cabrera is, at a minimum, a testifying expert, and Plaintiffs and some of their U.S.-based consultants have now admitted that they have disclosed documents to him,

---

[10] Any assertion of attorney-client privilege fails by virtue of Plaintiffs and Donziger providing such materials to Cabrera for use in his publicly filed report. *See In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007) (attorney-client privilege exists only if communications have been "kept confidential" and not disclosed to third parties); *see also* Cabrera RJN, Ex. JJ.

thereby resulting in waiver. Moreover, when a testifying expert offers the opinion of a non-testifying expert, the non-testifying expert's work is also subject to full discovery. *See, e.g., Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002); *Herman v. Marine Midland Bank*, 207 F.R.D. 26, 31 (W.D.N.Y. 2002) (allowing deposition of non-testifying expert where "the evidence clearly demonstrate[d] that the expert report . . . was the result of substantial collaborative work by [the expert] and [the non-testifying expert]").[11] Given that Cabrera has offered the opinions of Plaintiffs' experts, full discovery into those opinions is warranted.

### 3. No Supposed Ecuadorian "Privilege" Exists Here

Any suggestion that Ecuadorian, rather than U.S., privilege law applies would be meritless and unavailing. Section 1782's legislative history makes clear that the recognition *vel non* of a foreign privilege, let alone the weight to accord it, lies within the "complete discretion" of U.S. courts "to develop[] by case law." Consistent with this "complete discretion," Plaintiffs must identify a clearly established foreign privilege directly on point, not just hint at one whose existence is "far from clear." *In re Applic. for an Order Permitting Metallgesellschaft AG to Take Discovery*, 121 F.3d 77, 80 (2d Cir. 1997) (requiring "authoritative proof that a foreign tribunal would reject the evidence . . . because of a violation of the alleged privilege," not "simply . . . allegations to that effect"). But Plaintiffs have never offered any Ecuadorian authority in support of their Ecuadorian privilege arguments, and have rested entirely on frivolous assertions that documents provided to the court's auxiliary, Cabrera, are somehow privileged and remain

---

[11]  That rule extends, of course, even to materials "considered" by testifying experts. Fed. R. Civ. P. 26(a)(2)(B)(ii); *see also, e.g., Am. Steamship Owners Mut. Prot. & Indem. v. Alcoa Steamship Co.*, 2006 WL 212376, at *1 (S.D.N.Y. Jan. 26, 2006) ("[N]either the attorney-client privilege nor the work product doctrine protect from disclosure materials considered by [an expert]."); *Aniero Concrete Co. v. N.Y. City Sch. Constr. Auth.*, 2002 WL 257685, at *2 (S.D.N.Y. Feb. 22, 2002).

"in confidence and in accordance with Ecuadorian procedural rules," and that "no law or procedural rule in Ecuador . . . would require" disclosure. U.S. Filings RJN, Ex. K, 7 n.2; *id.*, Ex. G, 21. Plaintiffs, of course, have no "authoritative proof" of a foreign privilege, because the notion that a "Special Master" may make an official decision based upon secret communications with a party is anathema to any civilized system of justice.

### 4. The Crime-Fraud Exception Vitiates Any Potentially Applicable Privileges.

Finally, any attempt to assert any privilege over testimony or documents concerning Donziger's role in masterminding Plaintiffs' submission of fraudulent Judicial Inspection evidence, their collusion with Cabrera and in related efforts to conceal that collusion in the U.S., and their collusion with Ecuador fails under the crime-fraud exception. "It is well-established that communications that otherwise would be protected by the attorney-client privilege or the attorney work product privilege are not protected if they relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1038 (2d Cir. 1984). Here, Donziger orchestrated a scheme to tamper with expert testimony, to obstruct inquiry into that tampering, and to procure a fraudulent official report with the stated intent of extorting a settlement or enforcing a judgment based on that report in U.S. courts. Any claim of privilege to protect communications and documents furthering that scheme is baseless.

The District of New Jersey found that Chevron made a "prima facie demonstration of the operation of the crime-fraud exception" with regard to communications between Plaintiffs' U.S.-based consultant Uhl, Baron and Cabrera, because "the concept of an employee of a party covertly functioning as a consultant to a court-appointed expert in the same proceeding can only be viewed as a fraud upon that tribunal." U.S. Filings RJN, Ex. I, 43:23-44:16. Plaintiffs subsequently produced a privilege log (that Chevron currently is challenging) that confirms that

Donziger was directing the work of Uhl. Hendricks Decl., Ex. J, 129.

In addition to the *Crude* outtakes, there is other indisputable evidence that Plaintiffs are engaging in fraudulent conduct by concealing their collusion with Cabrera and his team:

- Plaintiffs' had their consultants write the Cabrera Report and were revising it literally days before it was filed in the Ecuadorian court on April 1, 2008. Hendricks Decl., Ex. J 89; 103; *see also* 94-112, 159. After Cabrera filed Plaintiffs' work as his own, Plaintiffs went through the charade of filing 107 pages of comments that characterize the Cabrera Report as the "Expert's work and conclusions" and criticize the Report as containing "omissions [that] are unjustly favorable to the defendant." *Id.*, Ex. II, 40, 60. As one of a litany of pretenses, they complained that "in calculating the unjustified enrichment, the expert has not considered which party has suffered the relative impoverishment," *id.* at 14, knowing full well that they rather than Cabrera had calculated the report's unjust enrichment figure. *Id.*, Ex. J, 89, 104 (e-mail regarding "revisions to proposed annex language concerning unjust enrichment.").

- Plaintiffs' consultants communicated directly with members of Cabrera's "team" in preparing the Cabrera Report and Cabrera's responses. Hendricks Decl., Ex. I, 1-6.

This collusion with Cabrera and his team constitutes fraudulent conduct, corrupting the Lago Agrio Litigation. *See, e.g.*, *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245 (1944) (relying on an article "signed by an ostensibly disinterested expert" but actually ghost-written by the party's counsel, then colluding with the purported author to suppress the true authorship, was "a deliberately planned and carefully executed scheme to defraud . . . .").

Donziger should not be allowed to hide evidence regarding his improper conduct behind claims of privilege. *See e.g.*, *In re John Doe, Inc.*, 13 F.3d 633, 635, 637-38 (2d Cir. 1994) (affirming order to compel attorney to testify regarding his communications with corporate CEO in his attempt to suborn perjury); *In re Sealed Case*, 754 F.2d 395, 398, 401 (D.C. Cir. 1985) (party that "'manipulate[d] the process of the courts for [its] own ends'" with perjured testimony, document destruction, and other misconduct "committed an ongoing fraud in litigation" sufficient to defeat attorney-client privilege under the crime-fraud exception).

The evidence is clear that Donziger played a substantial role in Plaintiffs' fraudulent conduct. Furthermore, Donziger's own awareness of his guilt, and of the wrongfulness of his conduct is manifest from the *Crude* outtakes. When one U.S. consultant says to Donziger that "it was bizarre having the perito [Cabrera] there" at the meeting discussing collusion, Donziger immediately turns to the *Crude* film crew and says: "That was off the record . . . understand?" Hendricks Decl., ¶ 23; Ex. A. To allow evidence of such conduct to be cloaked behind a veil of *any* asserted "privilege" would contradict the most basic notions of fairness and due process.

Donziger and Plaintiffs have made misrepresentations in multiple District Courts on a scale not often seen in civil litigation, and for a purpose more insidious than in most cases applying the crime-fraud exception. A litigant impersonating a nominally neutral expert commits a wrong that "cannot complacently be tolerated consistently with the good order of society," *Hazel-Atlas*, 322 U.S. at 246, and attorneys have been disbarred for comparable "gross misconduct." *Hatch v. Ooms*, 69 F. Supp. 788, 803 (D.D.C. 1947).

## IV.    CONCLUSION

For the foregoing reasons, Chevron respectfully requests that the Court enter an Order, pursuant to 28 U.S.C. § 1782, granting it leave to serve the attached Subpoena on Donziger. Given the nature of the fraudulent conduct here, Chevron also asks the Court make appropriate crime-fraud findings and to put in place requirements, procedures, or protocols necessary to preserve the evidence Chevron seeks during the pendency of this Application.

Dated: August 4, 2010
      New York, New York

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: _Randy M. Mastro_
      Randy M. Mastro

200 Park Avenue, 47th Floor
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Scott A. Edelman
2029 Century Park East
Los Angeles, California 90067
Telephone: 310.552.8500
Facsimile: 310.551.8741

Andrea E. Neuman
3161 Michelson Drive
Irvine, California 92612
Telephone: 949.451.3800
Facsimile: 949.451.4220

*Attorneys for Applicant Chevron Corporation*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------------ x
                                                                   :
In re Application of CHEVRON CORPORATION for        :
an Order Pursuant to 28 U.S.C. § 1782 to Conduct    :    Case No. M-19-111
Discovery for Use in Foreign Proceedings.           :
                                                                   :
                                                                   :
------------------------------------------------------------------ x
```

## FEDERAL RULE OF CIVIL PROCEDURE 7.1 STATEMENT FOR APPLICANT CHEVRON CORPORATION

Petitioner, Chevron Corporation, through counsel, Gibson, Dunn & Crutcher LLP, and

pursuant to Fed. R. Civ. P. 7.1, states that it is a publicly traded company (NYSE: CVX) that has

no parent company. No publicly traded company owns 10% or more of its shares.

Dated: August 4, 2010
New York, New York

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: _Randy M. Mastro_____
        Randy M. Mastro

200 Park Avenue, 47th Floor
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Scott A. Edelman
2029 Century Park East
Los Angeles, California 90067
Telephone: 310.552.8500
Facsimile: 310.551.8741

Andrea E. Neuman
3161 Michelson Drive
Irvine, California 92612
Telephone: 949.451.3800
Facsimile: 949.451.4220

*Attorneys for Applicant Chevron Corporation*