UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                                              :
In re Application of                                          :
                                                              :      10-mc-0002 (LAK)
CHEVRON CORPORATION, et al,                                   :
                                                              :      ECF Case
..............................................................:
                                                              :
This Document Applies to: ALL CASES                           :
                                                              :
---------------------------------------------------------------x


**STEVEN R. DONZIGER'S MEMORANDUM OF LAW IN SUPPORT
OF HIS MOTION TO QUASH OR MODIFY SUBPOENAS**

FRIEDMAN KAPLAN SEILER &
   ADELMAN LLP
Bruce S. Kaplan
Robert D. Kaplan
Ellen London
1633 Broadway
New York, NY 10019-6708
(212) 833-1100

*Attorneys for Steven R. Donziger*

August 27, 2010

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iii

PRELIMINARY STATEMENT ................................................................. 1

FACTUAL BACKGROUND ...................................................................... 3

ARGUMENT ............................................................................................... 6

I. THE SUBPOENAS SHOULD BE QUASHED........................................ 6

    A.    Discovery From Counsel for Active Litigants is Disfavored ................ 7

    B.    The Subpoenas Are Overly Broad and Unduly Burdensome................ 9

        1.    The Subpoenas Demand Vast Amounts of Material Unrelated to the Issues Raised in the Applications ........................................ 9

        2.    The Subpoenas Impose an Undue Burden on Donziger.......... 12

    C.    The Subpoenas Seek Privileged Documents and Communications .................... 13

    D.    Many of the Requested Materials Are Available From Other Sources ............... 16

    E.    The *Intel* Discretionary Factors Also Weigh Against The Applications ............. 17

        1.    Much Of The Discovery Sought From Donziger Is Available Without Section 1782 Discovery ......................................... 17

        2.    Applicants Have Failed To Demonstrate That The Foreign Tribunals Would Be Receptive to the § 1782 Discovery ......... 18

        3.    Applicants Are Attempting To Circumvent the Foreign Fact-Finding Processes ................................................ 18

II. IN THE ALTERNATIVE, THE SUBPOENAS SHOULD BE MODIFIED........................ 20

    A.    The Subpoenas Should Be Limited to Evidence of Allegedly Improper Communications Between Donziger and Cabrera or Prosecutorial Authorities ................................................ 20

    B.    Inappropriate Definitions and Instructions Should Be Modified ......................... 22

    C.    Only a Single Deposition Limited to the Relevant Issues Should Be Permitted ................................................ 24

CONCLUSION ............................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

<small>CASES</small>

*In Re Application of OOO Promnefstroy*,
   No.M 19-99, 2009 U.S. Dist. LEXIS 98610 (S.D.N.Y. Oct. 15, 2009) .................... 19

*Aventis Pharma v. Wyeth*,
   2009 WL 3754191 (S.D.N.Y. 2009) ...................................................................... 18

*In re BankAmerica Corp. Sec. Litig.*,
   270 F.3d 639 (8th Cir. 2001) ................................................................................ 15

*Chevron Corporation v. Stratus Consulting, Inc.*,
   Index No. 10-cv-00047 (D. Co.) ............................................................................ 6

*Concord Boat Corp. v. Brunswick Corp.*,
   169 F.R.D. 44 (S.D.N.Y.1996) ............................................................................. 10

*Coorstek, Inc. v. Reiber*,
   No. 08-cv-01133, 2010 U.S. Dist. LEXIS 42594 (D. Colo. Apr. 5, 2010) ............... 13

*Evans v. Atwood*,
   No. 96-2746, 1999 U.S. Dist. LEXIS 17545 (D.D.C. Sept. 29, 1999) ....................... 7

*Gragg v. Int'l Mgmt. Group (UK), Inc.*,
   No. 5:03-CV-0904, 2007 WL 1074894 (N.D.N.Y. Apr. 5, 2007) ............................. 8

*Intel Corp. v. Advanced Micro Devices, Inc.,*
   542 U.S. 241, 264 (2004) ..................................................................................... 19

*In re Microsoft Corp.*,
   428 F. Supp. 2d 188 (S.D.N.Y. 2006) ................................................................... 17

*NBC v. Bear Stearns & Co., Inc.*,
   165 F.3d 184 (2d Cir. 1999) ................................................................................. 19

*Nova Biomedical Corp. v. i-STAT Corp.*,
   182 F.R.D. 419 (S.D.N.Y.1998) ........................................................................... 12

*Republic of Kazakhstan v. Beidermann*,
   168 F.3d 880 (5th Cir. 1999) ................................................................................ 19

*ResQnet.com v. Lansa, Inc.*,
   No. 01 Civ. 3578, 2004 WL 1627170 (S.D.N.Y. July 21, 2004) ..................... 8, 9, 16

*In re Richard Roe, Inc.*,
    68 F.3d 38 (2d Cir. 1995) ........................................................ 15

*In re Richard Roe, Inc.*,
    168 F.3d 69 (2d Cir. 1999) ............................................. 14, 15

*Sea Tow Int'l, Inc. v. Pontin*,
    246 F.R.D. 421 (E.D.N.Y. 2007) ..............................7, 8, 11, 16

*SEC v. Strauss*,
    No. 09 Civ. 4150, 2009 WL 3459204 (S.D.N.Y. Oct. 28, 2009) ............................ 16

*Shelton v. American Motors Corp.*,
    805 F.2d 1323 (8th Cir. 1986) ................................................ 7

*In re: Subpoena Issued to Dennis Friedman*,
    350 F.3d 65 (2d Cir. 2003) ......................................... 7, 8, 16

*United States v. Jacobs*,
    117 F.3d 82 (2d Cir. 1997) .................................................. 14

*United States v. Nixon*,
    418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) ............................ 12

*United States v. Pelaez*,
    No. 96 Cr. 464, 1997 U.S. Dist. LEXIS 11334 (S.D.N.Y. Feb. 20, 1997) ................ 12

*United States v. Philip Morris Inc.*,
    209 F.R.D. 13 (D.D.C. 2002) ................................................. 7

*United States v. Yonkers Bd. of Educ.*,
    946 F.2d 180 (2d Cir. 1991) ................................................. 7

**STATUTES**

28 U.S.C. § 1782 ............................................................... *passim*

Steven R. Donziger respectfully submits this memorandum of law in support of his motion to quash or modify the subpoenas served upon him by Chevron Corporation ("Chevron"), Ricardo Reis Veiga and Rodrigo Perez Pallares (collectively, the "Applicants") pursuant to the Court's order of August 6, 2010 (the "Order").

## PRELIMINARY STATEMENT

In their prior request for leave to subpoena the outtakes from *Crude*, Applicants alleged that they were seeking evidence that the report of court-appointed damages expert Richard Stalin Cabrera Vega was not independently created, but was the product of some improper "collusion" between Cabrera and the *Lago Agrio* plaintiffs' counsel, and evidence that plaintiffs' counsel improperly instigated the criminal prosecution of Texaco Petroleum attorneys Veiga and Perez. Purportedly seeking evidence to corroborate the same allegations, Applicants have now served document and deposition subpoenas on plaintiffs' lead American counsel, Steven R. Donziger.

While even narrow and focused discovery of opposing counsel in a pending litigation is discouraged, Applicants' subpoenas are anything but narrow and focused.[1] To the contrary, they are of stupendous breadth. Wholly without regard to the attorney-client privilege or the work product doctrine, let alone relevance, the subpoenas demand, *inter alia*, discovery of Donziger's communications with his clients, co-counsel, consulting experts, even his *own* counsel on this application, having nothing whatsoever to do with any interaction with Cabrera or his staff, or with the instigation of criminal proceedings. Of the 126 document demands served by Applicants (68 by Chevron, 58 by Veiga and Perez), no more than 20 are even

---

[1] Copies of the subpoenas are attached as Exhibits A and B to the Declaration of Robert D. Kaplan, filed concurrently with this memorandum of law.

arguably relevant to the issues on which the applications were based, and most of those are overbroad. The subpoenas amount to a demand for the wholesale turnover of opposing counsel's files and, as such, they are dramatically improper.

        The Court has previously stated its view that seeking evidence of alleged improprieties in the preparation of the Cabrera report, or in the commencement of the criminal prosecution of Veiga and Perez, justified production of the *Crude* outtakes. Even assuming that the same considerations would be applicable to discovery of opposing counsel – as opposed to a non-lawyer third party – no justification has been offered, and there is none, for burdensome and intrusive discovery into the privileged communications and work product of adversary counsel that do *not* evidence or relate to any such alleged improprieties.[2] The Court granted its Order *ex parte*, holding that Donziger would not be prejudiced because he could move against the subpoenas as appropriate. The subpoenas should now be quashed because they range so far beyond the issues on which the applications were premised, because they trample on the privileges and immunities from discovery applicable to the work of opposing counsel, and because responding would impose an extraordinary burden on Donziger. Indeed, simply segregating, logging, and redacting documents to deal with privileged material would take months.

--------

[2] The Applicants have not cited any order, rule, regulation, or law that would prohibit any party to the *Lago Agrio* litigation (whether the plaintiffs or Chevron) from meeting *ex parte* with either Cabrera or any other expert. Nor have they suggested that the Ecuadorian court – the court with knowledge of Ecuadorian law and procedure, and of the facts of this case – has indicated any concern with the propriety of such contacts. Donziger does not concede – and denies – Applicants' unsupported contention that there was some improper "collusion" between the plaintiffs and Cabrera. (Chevron Mem. at 10, 16.)

If one read only the memoranda submitted by Applicants, and not the subpoenas themselves, one would assume that the subpoenas were precisely crafted inquiries designed only to obtain evidence related to the issues Applicants have raised. Because the subpoenas are nothing of the kind, but instead an abuse of the 28 U.S.C. § 1782 process aimed at facilitating an extensive, burdensome, and fundamentally unfair intrusion into the work of opposing counsel, they should simply be quashed. At a minimum, they should be modified so that they are strictly limited to the production of documents evidencing the alleged "collusion" with Cabrera or the alleged instigation of criminal proceedings. Any deposition should be limited to the same subjects.

## FACTUAL BACKGROUND[3]

Steven R. Donziger graduated from Harvard Law School in 1991. Since 1993, he has served as counsel to Ecuadorian clients who have sued Chevron for environmental damage, deaths, and physical injuries arising from the pollution caused by 30 years of oil exploitation in Ecuador. Donziger currently spends all of his professional time in connection with such litigation.

More than fifteen months after the release of *Crude*, a documentary on the *Lago Agrio* litigation, Applicants sought and obtained from this Court an order allowing them to subpoena outtakes from the movie based on the contention that the outtakes would reveal evidence that plaintiffs' counsel had somehow "improperly" influenced the work of court-appointed damages expert Richard Stalin Cabrera Vega, and somehow "improperly" influenced the decision to commence criminal proceedings against Perez and Veiga.

---

[3] Certain facts are set forth in the Affidavit of Steven R. Donziger, filed concurrently with this memorandum of law.

On August 4, 2010, Applicants sought an *ex parte* order allowing them to take discovery from Donziger. They argued that the *Crude* outtakes supported the allegation that plaintiffs' counsel had somehow improperly influenced Cabrera, pointing to a scene in which Donziger met with Cabrera before his appointment by the court. Applicants characterize this as "an elaborate session with Power Point," and allege that, at the meeting, the participants were "planning in detail the 'global damages assessment' that Cabrera would later submit to the court as his purportedly 'neutral' and 'independent' report." (Chevron Mem. at 2.) Applicants argued that they needed discovery from Donziger to further document counsel's "improper" contacts with, and influence on, Cabrera.

Applicants also alleged that, through a series of press conferences, demonstrations, and a meeting with the president of Ecuador, plaintiffs' counsel somehow improperly influenced the Ecuadorian prosecutor's decision to file charges against Veiga and Perez. (Veiga and Perez Mem. at 4-13.) They argued that discovery from Donziger was needed to further document such efforts.

The subpoenas served by Applicants do seek to discover communications between plaintiffs' counsel and Cabrera's team, and documents reflecting the instigation of criminal proceedings, but that is only a fraction of what they demand. The subpoenas seek all documents relating to many of plaintiffs' consulting experts and other advisors, without regard to any communication to or from Cabrera (*see, e.g.*, Chevron Requests[4] 11-14; Perez/Veiga Requests 9-12), all documents relating to various third-party organizations, without regard to any

---

[4] References to specific requests or definitions in the subpoena issued by Chevron are designated "Chevron Request __" or "Chevron Definition __" and references to specific requests or definitions in the subpoena issued by Perez and Veiga are designated "Perez/Veiga Request __" or "Perez/Veiga Definition __".

communication to or from Cabrera, or anyone related to the criminal cases (*see*, *e.g.*, Chevron Requests 20, 25, 27-30; Perez/Veiga Requests 18, 23), documents relating to file-sharing protocols and translation services used by plaintiffs' counsel or advisors, (Chevron Requests 64-67; Perez/Veiga Requests 50-54), documents relating to pension funds and shareholder groups (Chevron Request 68), documents relating to fee arrangements with clients (Chevron Request 49), documents relating to Donziger's communications with his own lawyers in connection with this application (Chevron Request 60; Perez/Veiga Request 47), and much more.

Even with respect to the Cabrera report and the criminal prosecutions, the subpoenas go far beyond any allegedly improper contacts with Cabrera or with prosecutors. The subpoenas seek purely internal communications of plaintiffs' legal team about the Cabrera report and the criminal cases – matters which plaintiffs' counsel had every right to discuss. For example, the subpoenas seek documents about communications within the plaintiff group about Cabrera or his report, regardless of whether anything was communicated to Cabrera (*see*, *e.g.*, Chevron Request 4; Perez/Veiga Request 4), documents about communications within the plaintiff group about the Cabrera work plan, regardless of whether anything was communicated to Cabrera (Chevron Request 44; Perez/Veiga Request 31), documents about communications within the plaintiff group about expert work that might appear in the Cabrera work plan or report, regardless of whether anything was communicated to Cabrera (Chevron Request 46; Perez/Veiga Request 32), documents about communications within the plaintiff group concerning the submission of comments on the Cabrera report (Chevron Request 40; Perez/Veiga Request 27), and documents about plaintiffs' own judicial inspection experts (Chevron Request 41; Perez/Veiga Request 28).

Similarly, while the subpoenas call for documents about communications between the plaintiff group and the Ecuadorian government concerning the criminal cases (Chevron Request 61; Perez/Veiga Request 48), they also seek "all documents relating to the criminal cases" (Chevron Request 6; Perez/Veiga Request 6). In other words, the subpoenas seek everything plaintiffs' counsel might have communicated to their clients, or within their own group, about the criminal cases, wholly without regard to whether such communications in any way involved any improper conduct of any kind.

## ARGUMENT

### I.

### THE SUBPOENAS SHOULD BE QUASHED

As a general matter, and for obvious reasons, courts are extremely reluctant to allow counsel for one party to an ongoing litigation to take discovery into the work product and communications of adversary counsel. Here, the subpoenas should be quashed not simply because of the concerns that are always present in these circumstances, but also because they are extraordinarily overbroad and burdensome, straying far beyond the issues raised in the applications and seeking a vast amount of internal material from opposing counsel; because they demand production of documents obviously protected by privilege; and because they seek material that, to the extent not privileged, can be obtained from other persons, without the need to burden opposing counsel. In addition, discovery is allowable here at all only pursuant to 28 U.S.C. § 1782. The factors courts have applied in the exercise of their discretion under that statute militate against enforcement of these subpoenas.

## A.  Discovery From Counsel for Active Litigants is Disfavored

Applicants treat their subpoenas to Donziger as just one more front in their nationwide § 1782 campaign,[5] but there is a fundamental difference.  Donziger is opposing counsel in active litigation.[6]  "Courts have been especially concerned about the burdens imposed on the adversary process when lawyers themselves have been the subject of discovery requests, and have resisted the idea that lawyers should routinely be subject to broad discovery."  *In re: Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 70 (2d Cir. 2003).  This resistance reflects "concern that the relationship between attorneys and clients be protected."  *Id.*; *see also Sea Tow Int'l, Inc. v. Pontin*, 246 F.R.D. 421, 424 (E.D.N.Y. 2007)) ("In the Second Circuit, 'depositions of opposing counsel are disfavored.'") (quoting *United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 185 (2d Cir. 1991)).

Tellingly, Chevron made this very point when it sought discovery from Alberto Wray, a *former* lawyer for the *Lago Agrio* plaintiffs.  *In re Application of Chevron Corp.*, No. 10-mc-371(CKK)(DAR) (D.D.C., Memorandum of Law filed June 8, 2010).  There, Chevron

---

[5] Copies of subpoenas that the Applicants have served or sought authorization to serve are attached as Exhibits C – II of the Declaration of Robert D. Kaplan.

*See Chevron Corporation v. Stratus Consulting, Inc.*, Index No. 10-cv-00047 (D. Co.); *In re Application of Chevron Corporation*, Index No. 10-371 (D.D.C.); *In re Application of Chevron Corporation*, Index No. 10-cv-02675 (D. N.J.); *In re Application of Chevron Corporation*, Index No. 10-MI-0076 (N.D. Ca.); *In re Application of Chevron Corporation*, Index No. 10-cv-01146 (S.D. Ca.); *In re Application of Chevron Corporation*, Index No. M-19-111 (S.D.N.Y.); *In re Application of Chevron Corporation*, Index No. H-10-134 (S.D.Tex.); *Chevron Corp. v. Charles Champ*, Index No. 10-mc-00027 (W.D.N.C.); *Chevron Corp., To Issue Subpoenas for the Taking of Deposition and the Production of Documents*, Index No. 10-mc-00021 (D.N.M.); *In re Application of Chevron Corporation*, Index No. 10-cv-686 (M.D. Tenn).

[6] While Donziger is not counsel "of record" in the *Lago Agrio* litigation, it is undisputed that he is a central member of plaintiffs' legal team both in Ecuador and the United States.

asserted that discovery should be permitted where it would not interfere with an attorney's "*ongoing representation of the client.*" *Id.* at 10 (emphasis added). Chevron relied on *United States v. Philip Morris Inc.*, 209 F.R.D. 13 (D.D.C. 2002), which held that the rule set out in *Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986), circumscribing depositions of opposing counsel, did not apply to non-litigation counsel acting solely as a fact witness. Chevron also cited *Evans v. Atwood*, No. 96-2746, 1999 U.S. Dist. LEXIS 17545, at *10-11 (D.D.C. Sept. 29, 1999), which held that where "there is nothing to suggest [that the lawyer] currently plays a major role," *Shelton* did not apply. Put otherwise, Chevron argued that § 1782 discovery was appropriate with respect to Wray precisely because he was not Donziger – not current litigation counsel actively involved in the prosecution of the *Lago Agrio* case.

In *In re Friedman,* the Second Circuit advised judges to consider the need for the discovery, the lawyer's role in connection with the pending litigation and the specific matter on which discovery is sought, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted, when ruling on an application to take discovery from opposing counsel. These factors weigh against enforcing the subpoenas to Donziger.

First, Chevron is seeking the same materials from other parties around the country. Virtually every request concerns communications from or to a vast array of persons defined as "PLAINTIFF AFFILIATED PEOPLE" (*see* Chevron Definition 32; Perez/Veiga Definition 30; Chevron Requests 1-5, 7-41, 44-46, 49, 51-53, 56, 58, 60-62, 68; Perez/Veiga Requests 1-4, 7-28, 31-33, 38-40, 43, 45, 47-49), and Chevron can seek (and in many cases is seeking) these documents from sources other than plaintiffs' lawyer. *See Sea Tow*, 246 F.R.D. at 426 (quashing subpoena where "much, if not all, of the information . . . can be acquired from" others); *ResQnet.com v. Lansa, Inc.*, No. 01 Civ. 3578, 2004 WL 1627170, at *5 (S.D.N.Y. July

21, 2004) (denying deposition of counsel where it had not been shown that information could not be obtained through "means other than . . . [counsel's] testimony").

The risk of encountering privilege and work-product issues may be a dispositive consideration. *See Gragg v. Int'l Mgmt. Group (UK), Inc.*, No. 5:03-CV-0904, 2007 WL 1074894, at *9 (N.D.N.Y. Apr. 5, 2007) ("this factor alone is outcome determinative on the question of whether [the] deposition should be allowed"). Here, almost everything Applicants seek involves communications among "PLAINTIFF AFFILIATED PEOPLE" – "any PERSON directly or indirectly assisting PLAINTIFFS in the LAGO AGRIO LITIGATION, including without limitation PLAINTIFFS' LAWYERS, PLAINTIFFS' JUDICIAL INSPECTION EXPERTS, [and plaintiffs' consulting experts] . . . ." – and virtually everything Applicants seek will therefore raise privilege and work product concerns. Finally, the extent of the discovery already conducted weighs against Applicants given the years of discovery that have already been completed in this case. *See ResQnet.com*, 2004 WL 1627170, at *6 ("[T]he fourth *Friedman* factor . . . weighs against Lansa because virtually all of the discovery has been conducted and completed. . . .").

**B.      The Subpoenas Are Overly Broad and Unduly Burdensome**

   **1.      The Subpoenas Demand Vast Amounts of Material Unrelated to the Issues Raised in the Applications**

The Applicants justify taking discovery from opposing counsel with the argument that they need to gather documents and testimony showing "improper" influence on Cabrera or on the Ecuadorian prosecutors. Yet what they seek amounts to unfettered access to all documents and communications from or to anyone and everyone involved in representing or advising the *Lago Agrio* plaintiffs on virtually any matter. The only materials even remotely relevant to Applicants' allegations – communications with Cabrera or his staff about his

workplan or report, and communications with government officials about commencing criminal proceedings – make up a small fraction of the requests. The rest is simply a freewheeling inquiry into the internal work of opposing counsel and their advisors.

The Court has indicated its sympathy with discovery aimed at proving purported "collusion" with Cabrera or the improper instigation of a criminal prosecution. Applicants have taken that as an invitation to draw up a wish list of discovery they would like to take from opposing counsel, and they have done just that, while purporting in their briefs to seek discovery on the specific issues raised in their applications. Where, as here, the subpoenas served pursuant to a § 1782 application wander far afield from the purported purpose of the application, they should be quashed. *See Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 50 (S.D.N.Y.1996) ("[t]o the extent a subpoena sweepingly pursues material with little apparent or likely relevance to the subject matter it runs the greater risk of being found overbroad and unreasonable.").

Of the 68 requests in the Chevron subpoena, only 20 even refer to Cabrera (defined to include all of his assistants) or to the criminal cases (Chevron Requests 1-4, 6, 40, 43-46, 51-56, 59-61, 63). The rest concern the work of, and counsel's communications with, plaintiffs' own experts and consultants (*see, e.g.*, Chevron Requests 11-14, 16-19), communications with various third party organizations (*see, e.g.*, Chevron Requests 20, 25, 27-30), Donziger's retention as counsel for plaintiffs and his fee arrangements (Chevron Requests 47-49), Donziger's communications with his own counsel on this application (Chevron Request 60), the translation of documents (Chevron Requests 64-66), counsel's maintenance of any website or use of any file transfer protocol (Chevron Request 67), and documents and correspondence related to other matters and third parties without any articulated relationship to

the purported purpose of the application (*see, e.g.*, Chevron Request 68, seeking, among other things, communications with pension funds concerning Chevron). Of the 58 requests in the Perez and Veiga subpoena, only 21 mention Cabrera or the criminal cases (Perez/Veiga Requests 1-4, 6, 27, 30-33, 37-43, 46-48, 50, 57). The balance cover the same extraneous topics as the Chevron subpoena.

Most of the requests that do refer to Cabrera or the criminal cases are themselves overbroad, seeking far more than evidence of communications with Cabrera, or communications with government officials related to the commencement of the criminal cases. Applicants seek documents reflecting internal discussions among plaintiffs' lawyers and their advisors about Cabrera, his work plan or report, without regard to whether anything was communicated to Cabrera. (*See, e.g.*, Chevron Requests 2, 4, 44-46, 54-56; Perez/Veiga Requests 2, 4, 27, 31-33, 41-43). Likewise, they seek all documents relating to the criminal cases whether or not bearing in any way on any effort to instigate the prosecutions. (Chevron Request 6; Perez Veiga Request 6).[7]

The subpoenas are not a good faith effort to gather materials evidencing undue influence on Cabrera or on the decision to prosecute Perez and Veiga. They are a bad faith attempt to gain wholesale access to the work product and communications of opposing counsel and their experts. Accordingly, the subpoenas should be quashed.

---

[7] Other requests are equally far afield. For example, both subpoenas seek documents related to the translation of the Cabrera report (Chevron Request 63; Perez/Veiga Request 50), and the Perez and Veiga subpoena requests, without limitation, all communications with any persons who are "subjects of the Criminal Cases" (Perez/Veiga Request 57).

## 2.    The Subpoenas Impose an Undue Burden on Donziger

Under Fed. R. Civ. P. 45(c)(3)(A)(iv), a court *shall* quash or modify a subpoena if it "subjects a person to undue burden." *See, e.g., Sea Tow Int'l, Inc. v. Pontin*, 246 F.R.D. 421, 428 (E.D.N.Y.,2007) (quashing subpoena that was "patently overbroad" and sought documents likely to be privileged); *Nova Biomedical Corp. v. i-STAT Corp.*, 182 F.R.D. 419, 423 (S.D.N.Y.1998) (affirming magistrate's order quashing subpoenas that were overbroad and therefore unduly burdensome); *United States v. Pelaez*, No. 96 Cr. 464, 1997 U.S. Dist. LEXIS 11334, at *3 (S.D.N.Y. Feb. 20, 1997) (quashing subpoena where the document request was "overbroad and a patent attempt at a forbidden 'fishing expedition'") (quoting *United States v. Nixon*, 418 U.S. 683, 700, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)).

Here, in light of the extraordinary breadth of the subpoenas, the burden is obvious and extreme. Indeed, the burden is reflected in the definitions and instructions themselves. Most of the requests cover documents from or communications by or to all "PLAINTIFF AFFILIATED PERSONS," which includes all 48 *Lago Agrio* plaintiffs, all of their lawyers, all of their experts, anyone else "directly or indirectly assisting" them, and even the government of Ecuador. (Chevron Definition 32; Perez/Veiga Definition 30). No time frame is set, despite the fact that litigation has been ongoing for 20 years. The definition of "CRIMINAL CASES" in the subpoenas is more than a page long, and references eighteen separate investigations or proceedings, most of which were concluded long ago. (Chevron Definition 16; Perez/Veiga Definition 15).

It is no exaggeration to say that the subpoenas would essentially require Donziger to review all of his files related to the *Lago Agrio case* and related litigation. That would be prohibitively burdensome and time consuming for Donziger (who has only two associates) under any circumstances. In light of the fact, discussed below, that vast numbers of documents would

be privileged, the additional burden of privilege review, logging and redacting would make the task even more unreasonable.

**C.      The Subpoenas Seek Privileged Documents and Communications**

Under Fed. R. Civ. P. 45 (c)(3)(A)(iii), the court *shall* quash or modify a subpoena if it "requires disclosure of privileged or other protected matter and no exception or waiver applies." Privileged materials are also expressly outside the scope of discovery authorized by § 1782. Here, it is difficult to find more than a handful of requests that do not, on their face, call for the disclosure of privileged communications and attorney work product. As noted above, the vast majority of the requests seek documents prepared by plaintiffs' lawyers and experts for their own internal use.

Applicants seek documents evidencing communications between plaintiffs' counsel and their consulting experts. It is well-established that such communications are protected by the attorney-client privilege. *See, e.g., Coorstek, Inc. v. Reiber*, No. 08-cv-01133, 2010 U.S. Dist. LEXIS 42594, at *12-*13 (D. Colo. Apr. 5, 2010) ("confidential communications between a party's counsel and a non-testifying expert or consultant, hired in anticipation of litigation, are protected by the attorney-client privilege").

Applicants go even farther afield, arguing that they should be able to subpoena not only consulting expert work product, not only communications between counsel and consulting experts, but also *attorney* work product, communications among the attorneys themselves, and communications between attorney and client that relate to the expert work product or communications with the experts. That proposition is wholly unfounded.

Finally, Applicants stretch the crime-fraud exception far beyond its limits and argue that it justifies the wholesale turnover of expert work product, attorney communications with experts or about experts, and attorney communications with a variety of third parties. The

crime-fraud doctrine is a "limited" exception, "[g]iven that the attorney-client privilege and work product immunity play a critical role in our judicial system." *In re Richard Roe, Inc.*, 168 F.3d 69, 71 (2d Cir. 1999). To justify the application of the exception, the applicant must make a specific and detailed showing, which Applicants have not done here, tying the particular communication they seek to discover to the furtherance of a crime or fraud. *See United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997).

As a preliminary matter, Applicants have not established any "crime" or "fraud." They have pointed to no prohibition on "ex parte" contacts between either plaintiffs or Chevron and any court expert. They have pointed to no prohibition on the submission of materials by either party to Cabrera or any other court expert, or even on the drafting of materials for expert reports. They have not denied that Chevron had private meetings with court experts. And they have ignored that the issue of plaintiffs' contacts with Cabrera, and submission of materials to Cabrera, is currently before the *Lago Agrio* court, yet that court has found no "crime" or "fraud." It is remarkable that Applicants would ask an American court to make a finding, based on Ecuadorian law, procedure, and the law of the case in *Lago Agrio*, that a crime or fraud was committed, when the Ecuadorian court itself has found no crime or fraud. This, after Chevron chose the Ecuadorian forum in the first instance.

In addition to their complete lack of a premise for applying the crime-fraud exception, Applicants' supposition that some expert work product was shown to Cabrera simply does not permit the wholesale discovery of *all* expert work product, or *all* attorney-expert communications.

The crime-fraud doctrine "has a narrow and precise application." *Jacobs*, 117 F.3d at 88. It requires:

> (i) a determination that "the client communication or attorney work
> product in question was *itself* in furtherance of the crime or fraud"
> and (ii) "probable cause to believe that the particular
> communication with counsel or attorney work product was
> *intended* in some way to facilitate or to conceal the criminal
> activity."

*In re Roe,* 168 F.3d at 71 (quoting *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995)). The

court in *Roe* emphasized that "'[t]o subject the attorney-client communications to disclosure,

they must *actually have been made with an intent to further an unlawful act.*'" *Id.* (quoting

*Jacobs*, 117 F.3d at 88). Here, Applicants have not made a precise showing with respect to

particular documents or communications. Instead, they posit an attempt to influence Cabrera –

*without even attempting to demonstrate that such an attempt, if it actually occurred, would be*

*improper under Ecuadorian law* – and then contend that this allegation can support discovery

into any document relating in any way to any expert and any communications with that expert,

absent any attempt to show that the particular communication was in aid of any fraud. That is

not the law.

      Based on a few scenes from *Crude,* Applicants ask the Court to conclude that all

expert work product, all attorney communications with experts, and all attorney work product

about experts was in furtherance of a fraud. The record before the Court allows for no such

inference. A party seeking to invoke the crime-fraud exception must point to specific

communications and the basis for assuming they were in furtherance of the crime or fraud. *See*

*In re BankAmerica Corp. Sec. Litig.*, 270 F.3d 639, 642 (8th Cir. 2001) ("A moving party does

not satisfy this burden merely by alleging that a fraud occurred and asserting that disclosure of

any privileged communications may help prove the fraud, it must be a specific showing that a

particular document or communication was made in furtherance of the client's alleged crime or

fraud."); *Roe*, 68 F.3d at 41 (remanding so the district court could examine each document and determine which, if any, were in furtherance of a crime or fraud . . .").

In sum, based on the fact that they believe (albeit without support from any relevant legal authority) that plaintiffs' counsel had improper communications with Cabrera, or with Ecuadorian prosecutors, Applicants ask the Court not to order disclosure of a limited set of documents bearing directly on such alleged conduct, but to order the wholesale turnover of privileged materials from opposing counsel. The privileged nature of what Applicants seek, as well as the fact that most of what they ask for does not bear at all on the contentions on which their application was based, warrants quashing the subpoenas.

**D.    Many of the Requested Materials Are Available From Other Sources**

A court "must limit" discovery of materials that "can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i). *See also Sea Tow*, 246 F.R.D. at 424 (citing Rule 26(b)(2)(C)). That rule carries particular force where discovery is sought from adversary counsel. *Friedman*, 350 F.3d at 70; *see also ResQNet.com*, 2004 WL 1627170, at *5 (requiring party seeking discovery from counsel to explain why the information could only be obtained from the lawyer).

Very little of what Applicants seek can be obtained only from Donziger. Most of the requests seek communications with other PLAINTIFF AFFILIATED PERSONS and with third parties, and Applicants have not explained why they cannot seek documents – to the extent they have a right to seek them at all – from those parties. Indeed, applicants have already served or sought leave to serve 33 subpoenas on third parties. *See* Kaplan Decl. Exs. C – II. While Applicants might have to serve additional subpoenas, "this is the normal mechanism for obtaining discovery from third parties . . . and the need for a subpoena does not diminish [Applicants'] obligation to obtain the material on [their] own." *SEC v. Strauss*, No. 09 Civ.

4150, 2009 WL 3459204, at *11 (S.D.N.Y. Oct. 28, 2009). Discovery from opposing counsel should be a last resort, limited to materials otherwise unavailable. There has been no such showing here.

**E.     The *Intel* Discretionary Factors Also Weigh Against The Applications**

Although the Court has found that it has authority to order discovery under 28 U.S.C. § 1782, the discretionary factors relevant to consideration of an application to take discovery for use in a foreign proceeding also point toward quashing the subpoenas.

**1.     Much Of The Discovery Sought From Donziger Is Available Without Section 1782 Discovery**

In determining whether this Court should exercise its discretion to grant an application under § 1782, "[t]he relevant inquiry is whether the evidence is available to the foreign tribunal." *In re Microsoft Corp.*, 428 F. Supp. 2d 188, 194 (S.D.N.Y. 2006). Where it is, "§ 1782 aid is both unnecessary and improper." *See id*.

Here, although the Ecuadorian courts would not likely have jurisdiction over Donziger, much of what the subpoenas seek – and almost all of what is relevant to the issues Applicants have raised – is in the possession of individuals and entities over whom the Ecuadorian courts undoubtedly have jurisdiction. If documents were provided to Cabrera or his staff, they can be obtained from Cabrera or his staff. And if Applicants have tried and failed to seek such discovery in Ecuador, this weighs against the application here. *See infra* n.9. If pressure was brought to bear on Ecuadorian officials, that can be discovered from those officials.

Chevron spent a decade trying to move this litigation from the United States to Ecuador, arguing all the while that the Ecuadorian legal system had the tools to handle the case. Applicants' do not explain why the Ecuadorian courts (or the Ecuadorian governmental

authorities, in the case of the Perez/Veiga Subpoena) would be unable to obtain much of the discovery now sought from opposing counsel.

### 2. Applicants Have Failed To Demonstrate That The Foreign Tribunals Would Be Receptive to the § 1782 Discovery

In a footnote buried on page 18 of its moving brief, Chevron acknowledges that the Ecuadorian court is considering a petition for an order clarifying that court's receptivity to the discovery Applicants are seeking in the United States. Faced with the risk that the court will announce its rejection of the § 1782 discovery, Chevron argues, without a citation to any case so holding, that § 1782 discovery should be permitted even if the foreign court explicitly states that it does not want what the party seeks to discover. Applicants note that U.S. courts have permitted § 1782 discovery in aid of *other* Ecuadorian proceedings, but that is beside the point. There is no evidence here that the *Lago Agrio* Court, the Criminal Court, or the BIT Panel is receptive to the evidence sought by the subpoenas. In the absence of a willingness to accept such evidence, permitting the intrusive, burdensome inquiry of opposing counsel is particularly inappropriate.

### 3. Applicants Are Attempting To Circumvent the Foreign Fact-Finding Processes

There should be little doubt that the Applicants have resorted to the United States courts because they are dissatisfied with the status of the foreign proceedings and now, at the last minute, are seeking to circumvent those forums' fact-finding processes. This is an ironic turn of events as it was Chevron that wanted to be in the Ecuadorian courts in the first place. Judge Batts recently remarked on a similar situation when denying an application under § 1782: "These sophisticated parties freely chose the French forum with all its requisite procedural rules." *Aventis Pharma v. Wyeth*, 2009 WL 3754191, at *1 (S.D.N.Y. 2009). The logic of Judge Batts's

ruling is no less compelling here – a sophisticated party like Chevron must live with the forum it chooses.[8]

The Perez/Veiga application is no less offensive to the governmental authorities handling the criminal proceedings pending in Ecuador.  The policy at the heart of § 1782 is the fostering of comity and respect for other nations.  By the Applicants' own admissions, the purpose of their § 1782 discovery is to undermine and attack the Ecuadorian courts, government, investigators, and prosecutors, not to aid them.[9]

*      *      *

The Subpoenas seek extraordinarily broad discovery from opposing counsel without regard to relevance to the issues raised in the applications, without regard to privilege, burden, or the availability of material from other non-lawyer sources.  This is not a case in which an otherwise reasonable subpoena contains some excess that should be trimmed.  Rather, it is a case in which a narrow application was a smokescreen to hide an effort to gain virtually

---

[8] The BIT Arbitration is not a tribunal for which § 1782 discovery may be sought.  Both Courts of Appeal that have considered whether an international arbitral tribunal constitutes a "foreign or international tribunal" for purposes of discovery under § 1782 have held that it does not.  *NBC v. Bear Stearns & Co., Inc.*, 165 F.3d 184 (2d Cir. 1999) ("Congress did not intend for [§ 1782] to apply to an arbitral body established by private parties."); *Republic of Kazakhstan v. Beidermann*, 168 F.3d 880 (5th Cir. 1999).  These decisions are not contrary to the Supreme Court's subsequent decision in *Intel Corp. v. Advanced Micro Devices, Inc.*, which did not involve a proceeding analogous to the BIT arbitration.  542 U.S. 241, 264 (2004).

[9] It bears noting that where a party has tried but failed to procure the discovery in a foreign jurisdiction, this factor weighs heavily against the § 1782 application.  *In Re Application of OOO Promnefstroy*, No.M 19-99, 2009 U.S. Dist. LEXIS 98610, at *29-*30 (S.D.N.Y. Oct. 15, 2009) ("Put simply, this Court would not provide 'efficient means of assistance' to litigants by giving parties an incentive, after losing in their original requests for information in the foreign tribunal, to rush to the United States in hopes of obtaining a second bite at the apple. . . . [O]rdering the discovery would not encourage foreign countries by example, unless that example is to aid litigants in circumventing the judicial systems of foreign countries.").

unlimited access to the work product and communications of opposing counsel, experts, and advisors. That attempt should be rejected and the subpoenas quashed.

## II.

## IN THE ALTERNATIVE, THE
## SUBPOENAS SHOULD BE MODIFIED

For the reasons stated above, the subpoenas should be quashed. In the alternative, the Court should modify the subpoenas so that they are strictly limited to the issues raised in the applications, so that Donziger is not unduly burdened, and so that the applicable rules are followed.[10]

### A.     The Subpoenas Should Be Limited to Evidence of Allegedly Improper Communications Between Donziger and Cabrera or Prosecutorial Authorities

The Applicants hope to undermine the credibility of the work of Richard Stalin Cabrera Vega, and the validity of the criminal proceedings, by demonstrating that Cabrera and the Ecuadorian prosecutors were improperly influenced by plaintiffs' counsel. Any requests – the vast majority – that do not seek evidence of such allegedly "improper" communications or influence should be struck. If the subpoenas are not quashed, only the following Requests (modified as suggested below) are even remotely related to the Applicants' allegations:[11]

**Chevron Request 1; Perez/Veiga Request 1**: All DOCUMENTS PROVIDED by YOU or any PLAINTIFF

---

[10] Donziger respectfully suggests that the Court (i) require the Applicants to submit modified subpoenas not more than seven business days from the date of the Court's Order, and (ii) require Donziger to make any renewed objections and/or motion to quash not more than seven business days from the date of service of the modified subpoenas.

[11] Language added to the requests as served appears in bold type. Material deleted from the requests is stricken through. Donziger reserves his rights to assert any and all privileges with respect to individual responsive documents or deposition questions within these or any other topics.

AFFILIATED PERSON to CABRERA ~~or otherwise incorporated, in whole or in part, into the CABRERA REPORTS~~.

**Chevron Request 3;  Perez/Veiga Request 3:**  All COMMUNICATIONS between YOU ~~or any PLAINTIFF AFFILIATED PERSON~~ and CABRERA~~, and any DOCUMENTS RELATING TO such COMMUNICATIONS~~.

**Chevron Request 6; Perez/Veiga Request 6:**  All DOCUMENTS RELATING TO **communications with ECUADORIAN OFFICIALS seeking to initiate any pending criminal case against Perez and/or Veiga** ~~the CRIMINAL CASES~~.

**Chevron Request 43;  Perez/Veiga Request 30:**  All versions or drafts of the CABRERA WORKPLAN or CABRERA REPORTS, and all versions or drafts of any part of the CABRERA WORKPLAN or CABRERA REPORTS.

**Chevron Request 50:**  All DOCUMENTS RELATING TO any payment that any judge, judicial officer, or ECUADORIAN OFFICIAL has received for, or is to receive as a result of, any ruling, order, judgment, decision, or finding in the LAGO AGRIO LITIGATION.

**Perez/Veiga Request 37:**  All DOCUMENTS RELATING TO any payment that any judge, judicial officer, or ECUADORIAN OFFICIAL has received for, or is to receive as a result of, any ruling, order, judgment, decision, or finding in the CRIMINAL CASES.

**Chevron Request 51;  Perez/Veiga Request 38:**  All DOCUMENTS RELATING TO any past, present, or future financial transactions between YOU ~~or any PLAINTIFF AFFILIATED PERSON~~ and CABRERA, or any agreement regarding past, present, or future financial transactions between YOU ~~or any PLAINTIFF AFFILIATED PERSON~~ and CABRERA.

**Chevron Request 53;  Perez/Veiga Request 40:**  All ~~DOCUMENTS RELATED TO~~ contracts, agreements, or letters of understanding**, including drafts,** between or among YOU ~~or any PLAINTIFF AFFILIATED PERSON~~ and CABRERA.

**Chevron Request 54;  Perez/Veiga Request 41:**  All DOCUMENTS RELATING TO the planning, preparation, drafting, and filing of the CABRERA WORKPLAN or the CABRERA REPORTS.

**Chevron Request 55; Perez/Veiga Request 42:** All DOCUMENTS RELATING TO the appointment of CABRERA as a judicial inspection expert or the global damages expert in the LAGO AGRIO LITIGATION.

**Chevron Request 59; Perez/Veiga Request 46:** All DOCUMENTS RELATING TO the AUTHORSHIP of the CABRERA WORKPLAN or CABRERA REPORTS or any effort to conceal or delay the discovery of the AUTHORSHIP of the CABRERA WORKPLAN or CABRERA REPORTS.

**Chevron Request 61; Perez/Veiga Request 48:** All COMMUNICATIONS between YOU ~~or any PLAINTIFF AFFILIATED PERSON~~ and the GOVERNMENT OF ECUADOR or any ECUADORIAN OFFICIAL RELATING TO CABRERA, the CABRERA WORKPLAN, the CABRERA REPORTS, ~~the LAGO AGRIO LITIGATION, the EMA,~~ **or** the CRIMINAL CASES~~, and any DOCUMENTS RELATING TO such COMMUNICATIONS~~.

## B.     Inappropriate Definitions and Instructions Should Be Modified

The Instructions, Definitions, and Requests should be struck to the extent they impose obligations beyond those contemplated by the Federal or Local Rules.  In particular, some of the Definitions (such as "COMMUNICATIONS," "DOCUMENTS," and "IDENTIFY") are broader than those set forth for the same terms in L. Civ. R. 26.3.  *See* L.Civ.R. 26.3(a) ("No discovery request shall use broader definitions or rules of construction than those set forth [in the Rule]") and (c) (defining "communication," "document," and "identify").  Likewise, neither the Federal nor the Local Rules require the burdensome Bates-stamping protocol described in the Instructions.  Instruction 1 requires Donziger to Bates stamp responsive documents *before* they are reviewed for privilege.  While such an obligation would impose an additional cost, complication, and delay on the document review and production, it serves no useful purpose.  The Rules already require Donziger to identify all documents withheld from his production on the basis of privilege.  *See* F.R.C.P. 26(b)(5), 45(d)(2)(A); L. Civ. R. 26.2.  Finally, the

Instructions require Donziger's privilege log to include information not required by L. Civ. R. 26.2.

The subpoenas should be modified to clarify that they require Donziger to produce only those documents in his possession, custody, or control and found within this District. This clarification is necessary because of the overbroad definitions of "YOU" and "PLAINTIFF AFFILIATED PERSON," which are incorporated into the majority of Requests, and in order to bring the subpoenas into conformity with Fed. R. Civ. P. 34(a)(1)[12] and § 1782. This clarification would also accord with the scope of the Second Circuit's order in *In re Application of Chevron*, Nos. 10-1918-cv, 10-1966-cv (July 15, 2010), and the order of the Court in the District of Columbia § 1782 proceedings. There, Magistrate Judge Robinson refused to "require the production of documents other than those in the possession, custody and control of Alberto Wray in the District of Columbia . . . ." *See In re Application of Ricardo Reis Veiga and Rodrigo Perez Pallares To Issue a Subpoena for the Taking of a Deposition and the Production of Documents for Use in a Foreign Proceeding*, No. 10-mc-00370(CKK)(DAR) (Minute Order entered July 27, 2010).

The Subpoenas should be modified to make clear that they do not seek Donziger's work product, or communications with his clients or other entities with whom he shares a common interest. As currently drafted, the subpoenas make no effort to exclude from their scope documents that clearly constitute attorney-client communications and attorney work-product. While good faith disagreements about the privileged status of any particular document can be

---

[12] Federal Rule of Civil Procedure 34(c) extends the provisions of Rule 34 to subpoenas issued under Rule 45. *See* 1993 Advisory Comm. Notes to Rule 45.

resolved in the ordinary course, the subpoenas should be modified to make clear that they do not seek communications solely internal to plaintiffs' counsel and their clients and experts.

The return date of the subpoenas should be set to permit Donziger adequate time to respond to the subpoenas as modified. If the subpoenas are modified as suggested above, Donziger should be able to produce responsive, non-privileged documents within 60 days. Responding to the subpoenas as currently drafted would likely take six months.

Finally, in light of the burden imposed by the patently overbroad and inappropriate subpoenas served by Applicants, the Court should exercise its authority under Fed. R. Civ. P. 45 (c)(1) to require Applicants to reimburse Donziger's costs, including reasonable attorneys' fees, in connection with responding to the subpoenas.

## C.      Only a Single Deposition Limited to the Relevant Issues Should Be Permitted

If the deposition subpoenas are not quashed, Applicants should be permitted a single, seven-hour deposition limited to the subject matter of the document subpoenas as modified by the Court. The two document subpoenas overlap substantially. Accordingly, only one deposition is required. The Applicants may split their time, but questions asked by one lawyer should not be asked again, in words or substance, by the other.

## CONCLUSION

For the reasons set forth herein, the Court should quash the subpoenas.

Alternatively, the Court should modify the Subpoenas in the manner described above.

Dated:  New York, New York
       August 27, 2010

                          Respectfully submitted,

                          FRIEDMAN KAPLAN SEILER &
                            ADELMAN LLP


                            /s/ Bruce S. Kaplan
                        Bruce S. Kaplan
                        Robert D. Kaplan
                        Ellen London
                        1633 Broadway
                        New York, NY 10019-6708
                        (212) 833-1100

                        *Attorneys for Steven R. Donziger*