UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Application of:

CHEVRON CORPORATION, et al.,

                      *Applicants*,

for an Order Pursuant to 28 U.S.C. § 1782 to
Conduct Discovery for Use in Foreign
Proceedings

Index No. 10-mc-0002 (LAK)

---

**THE ECUADORIAN PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION TO QUASH OR MODIFY SUBPOENAS
SERVED UPON STEVEN R. DONZIGER**

---

Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
(212) 763-5000

TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ...........................................................................................ii-iv

INTRODUCTION ...........................................................................................................1

BACKGROUND .............................................................................................................4

      I.       Chevron's Pollution of the Ecuadorian Amazon .........................................4

      II.     The Lago Agrio Trial .................................................................................7

      III.    Chevron's Collateral Attacks on the Lago Agrio
            Trial: The BIT Arbitration and its Efforts to
            Invalidate the Cabrera Damages Report ...................................................11

      IV.    Chevron's Own Ex-Parte Contacts With the Lago Agrio Court...............13

      V.     The Matter of Plaintiffs' Contacts Is Pending In Ecuador.........................15

ARGUMENT...................................................................................................................18

      I.       Plaintiffs Incorporate Mr. Donziger's Brief in
            Support of His Motion to Quash the Subpoenas.......................................18

      II.     The Subpoena of Opposing Counsel is
            Disfavored and the Court Should Quash
            the Subpoenas Pursuant to Rule 26............................................................19

      III.    The Subpoenas Seek Privileged
            Materials and Testimony............................................................................20

               a.      Attorney-Client Privilege Applies .................................................20

               b.      Work Product Privilege Applies and
                      Has Not Been Waived by Disclosures to Cabrera .........................21

               c.      Much of any Disclosure to Ecuador or
                      Its Representatives is Subject to the
                      Common Interest Privilege ............................................................23

               d.      The Crime Fraud Exception Does Not Apply................................26

      IV.    The Subpoenas Fail Under All of the *Intel* Factors .................................28

CONCLUSION................................................................................................................31

<u>PAGE NO(s).</u>

<u>CASES</u>

*Aguinda v. Texaco, Inc.*,
    303 F.3d 470 (2d Cir. 2002)..............................................................................7, 8

*Aguinda v. Texaco, Inc.*,
    142 F. Supp. 2d 534 (S.D.N.Y. 2001),
    *aff'd*, 303 F.3d 470 (2d Cir. 2002) .......................................................................8

*Aventis Pharma v. Wyeth*,
    2009 WL 3754191 (S.D.N.Y. Nov. 9, 2009) .......................................................29

*Chevron Corp. v. Champ,*
    No. 1:10-mc-00027 (W.D.N.C) ...........................................................................3

*Chevron Corp. v. Stratus Consulting, Inc.*,
    No. 10-cv-00047 (D. Colo.)..................................................................................3

*ECDC Envtl., L.C. v. N.Y. Marine & Gen'l Ins. Co.*,
    No. 96 Civ. 6033,
    1998 WL 614478 (S.D.N.Y. June 4, 1998) ........................................................22

*In re Apotex, Inc.*,
    2009 WL 618243 (S.D.N.Y. Mar. 9, 2009) ........................................................28

*In re Application of Chevron Corp., et al.*,
    No. 1:10-mc-00001-LAK (S.D.N.Y.)....................................................................3

*In re Application of Chevron Corp., et al.*,
    No. 1:10-mc-00002-LAK (S.D.N.Y.)....................................................................3

*In re Application of Chevron Corp.*,
    No. 10-cv-02675 (D.N.J.) .....................................................................................3

*In re Application of Chevron Corp.*,
    No. 1:10-mc-00021 (D.N.M.) ...............................................................................3

*In re Application of Chevron Corp.*,
    No. 10-cv-01146 (S.D. Cal.)..................................................................................3

*In re Application of Chevron Corp.*,
    No. 10-MI-0076 (N.D. Ga.) ..................................................................................3

*In re Application of Chevron Corp.*,
    No. 3:10-cv-00686 (M.D. Tenn.)..........................................................................3

*In re Application of Chevron Corp.*,
    No. H-10-134 (S.D. Tex.) ................................................................... 3

*In Re Application of OOO Promnefstroy*,
    No. 2009 WL 3335608 (S.D.N.Y. Oct. 15, 2009) ................................ 29

*In re Grand Jury Subpoena Dated July 6, 2005*,
    510 F.3d 180 (2d Cir. 2007)................................................................ 21

*In re Grand Jury Subpoena*,
    223 F.3d 213 (3d Cir. 2000)................................................................ 27

*In re Grand Jury Subpoenas Duces Tecum*,
    798 F.2d 32 (2d Cir. 1986).................................................................. 26

*In re Microsoft*,
    428 F. Supp. 2d 188 (S.D.N.Y. 2006)........................................... 28, 29

*In re Richard Roe, Inc.*,
    168 F.3d at 71 ..................................................................................... 26

*In re Steinhardt Partners, L.P.*,
    9 F.3d 230 (2d Cir. 1993) ................................................................... 22

*In re Subpoena Issued to Dennis Friedman*,
    350 F.3d 65 (2d Cir. 2003)............................................................. 4, 19

*Intel v. Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004)............................................................................ 29

*Jota v. Texaco, Inc.*,
    157 F.3d 153 (2d Cir. 1998).................................................................. 8

*La. Mun. Police Employees Ret. Sys. v. Sealed Air Corp.*,
    253 F.R.D. 300 (D.N.J. 2008)............................................................. 22

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
    229 F.R.D. 441 (S.D.N.Y. 2004) ........................................................ 22

*NBC v. Bear Stearns & Co.*,
    165 F.3d 184 (2d Cir. 1999)................................................................ 30

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)............................................................................ 29

*Official Committee of Asbestos Claimants of G-I Holding, Inc. v. Heyman*,
    342 B.R. 416 (S.D.N.Y. 2006)............................................................ 26

*Republic of Ecuador v. Chevron Corporation, et al.*,
    10-1026 (CON) (2d Cir. 2010) .......................................................................... 11

*Schmitz v. Bernstein Liebhard & Lifshitz*, LLP,
    376 F.3d 79 (2d Cir. 2004)......................................................................... 29

*Sea Tow Int'l, Inc. v. Pontin*,
    246 F.R.D. 421 (E.D.N.Y. 2007) ....................................................... 20

*See Aguinda v. Texaco, Inc.*,
    945 F. Supp. 625 (S.D.N.Y. 1996)........................................................ 8

*Shahinian v. Tankian*,
    242 F.R.D. 255 (S.D.N.Y. 2007) ....................................................... 26

*U.S. v. Jacobs*,
    117 F.3d 82 (2d Cir. 1997)........................................................................ 26

*United States v. Constr. Prod. Res., Inc.*,
    73 F.3d 464 (2d Cir. 1996)......................................................................... 21

*United States v. Richard Roe, Inc.*,
    68 F.3d 40 (2d Cir. 1995) ................................................................... 26

*United States v. Zolin*,
    491 U.S. 554 (1989)................................................................................ 27

*William A. Gross Constr. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.*,
    262 F.R.D. 354 (S.D.N.Y. 2009) ....................................................... 22

**INTRODUCTION**

> THE COURT: ... I've been at this game for a very long time, longer than I care to admit, and I don't for a minute assume a priori that anyone's hands in this matter are clean. Anybody's.
>
> Ex. 53 at 33.[1]

The proposed subpoenas of attorney Steven Donziger arise in the midst of his active representation of Ecuadorian farmers and indigenous peoples in a titanic struggle with Chevron Corporation over the legacy of the company's oil extraction in the Ecuadorian Amazon. After nearly seventeen years of litigation, the applicants now propose to subpoena what effectively amounts to **all** documents that Mr. Donziger has retained during this multi-decade litigation.

Applicants do not come to this petition with clean hands. Chevron professes shock and dismay at the Ecuadorian legal system, after having touted that system for nine years in U.S. courts. Chevron claims "there is no evidence that Chevron is responsible for any environmental damage" in Ecuador. Mot at 1. An incredible statement, given that its own auditors found "contamination requiring remediation at *all* production facilities and a *majority* of the drill sites," and that "[a]ll produced water from the production facilities eventually discharged to creeks and streams." Ex. 49 at E-1-2 (emphasis added).

Based on some creative editing from a *Crude* outtake, Chevron claims Plaintiffs' consultants found "no evidence contamination from the pits spread into the surrounding

---

[1] Unless otherwise noted, all exhibits are attached to the Declaration of O. Andrew F. Wilson dated August 27, 2010.

groundwater," Mot. at 12.[2]  But in outtakes Chevron withheld from the Court, those consultants actually said: "we also have water with very, very high contents of carcinogenic minerals . . . . The contaminants are located all over.  If you just go through the area and you look at a small stream you will see the sheen of the oil on the water," Ex. 45 & Ex. 1, CRS 188-2, and "The ground water is contaminated. . . . [W]e know that Texaco is wrong, Chevron's wrong, you know, it's definitely some ground water contaminated, there's discharges that go right in the water ways."  *Id.* CRS 196-5 (emphasis added).[3]

And Chevron professes shock that Plaintiffs interacted with court expert Richard Cabrera, even though (i) Chevron cannot point to a single order, rule, regulation, or law prohibiting such contact; (ii) Chevron has never, not even once, denied it also had contacts with court experts in Lago Agrio; and (iii) the matter of contacts between Plaintiffs and Cabrera is currently before the Lago Agrio Court, and that court has given no indication that such contacts are improper.

Now Chevron's hypocrisy has come full circle, for it has been revealed that Chevron's lawyers met secretly and *ex parte*, not merely with court experts, but with *the court itself.*  Exs. 52, 60.  Chevron lawyers did so not once, but many times, freely

---

[2]  Chevron's media distribution of the outtakes it uses here was done in plain violation of a Second Circuit order.  Even before initially serving the parties in the Southern District, Chevron posted its Motion on Twitter, shared the Motion with a blogger previously paid by Chevron, and sent a worldwide press release.  Ex. 18.  And in further direct violation of the Second Circuit's order, Ex. 4, Chevron sent transcripts of the outtakes directly to a major American newspaper, Ex. 19, and Chevron's counsel, Gibson Dunn, actively encouraged bloggers to copy outtakes located at the courthouse.  Ex. 40.

[3]  Chevron hoped that its intimidation of Berlinger and repeated allegations of "collusion" would prevent Plaintiffs from seeing the full outtake that Chevron deliberately withheld from Plaintiffs and from the Court.  Chevron was wrong.

discussing the Lago Agrio case. *Id.* And when someone who worked with plaintiffs happened upon one of these secret meetings, Chevron's private security guards tried to chase him away. Ex. 60.[4]

This Court should not grant any further discovery by these applicants. These subpoenas are massive wish lists calculated to weigh down Plaintiffs' attorneys, invade attorney-client and work product privilege, and distract the Court and the public from the reality of a devastating seven-year, 200,000-page record of a stunning ecological catastrophe. These subpoenas are also intended to cripple Plaintiffs' litigation team at a time when it is already taxed in responding to the company's duplicative and expanding discovery efforts all over the United States. The Court can take judicial notice of Chevron's parade of § 1782 petitions at this very late stage of the Lago Agrio case: ten different applications across the United States,[5] document demands and deposition notices to twenty-three different respondents, some 262 filings by Chevron alone, comprising more than 22,000 pages of exhibits, filings and briefs. This, after Chevron fought so hard (and so successfully) to escape justice in an American courtroom.

The unique concern when active lawyers are subpoenaed – "the burdens imposed on the adversary process when lawyers themselves have been the subject of discovery

---

[4]    Chevron has a history of *ex parte* conduct in Ecuador. Ex. 34 ¶ 4.

[5]    *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047 (D. Colo.); *In re Application of Chevron Corp.*, No. 10-cv-02675 (D.N.J.); *In re Application of Chevron Corp.*, No. 10-MI-0076 (N.D. Ga.); *In re Application of Chevron Corp.*, No. 10-cv-01146 (S.D. Cal.); *In re Application of Chevron Corp., et al.*, No. 1:10-mc-00001-LAK (S.D.N.Y.); *In re Application of Chevron Corp.*, No. H-10-134 (S.D. Tex.); *In re Application of Chevron Corp., et al.*, No. 1:10-mc-00002-LAK (S.D.N.Y.); *In re Application of Chevron Corp.*, No. 3:10-cv-00686 (M.D. Tenn.); *In re Application of Chevron Corp.*, No. 1:10-mc-00021 (D.N.M.); *Chevron Corp. v. Champ*, No. 1:10-mc-00027 (W.D.N.C)

requests" – has led courts to strongly "resist[] the idea that lawyers should routinely be subject to broad discovery." *In re: Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 70 (2d Cir. 2003). The proposed discovery is extraordinarily broad, harassing, seeks privileged materials and materials available from other sources, and fails to satisfy 28 U.S.C. § 1782. Plaintiffs' motion to quash the subpoenas of their own lawyer should be granted.

## BACKGROUND

### I.    Chevron's Pollution of the Ecuadorian Amazon

Emboldened by its § 1782 circus, Chevron makes the remarkable claim that "there is no evidence that Chevron is responsible for any environmental damage" in Ecuador. Mot at 1. Even by Chevron's standards, this claim is dumbfounding. For the last two decades Steven Donziger has helped lead one of the largest environmental litigations in the world to remedy one of the largest oil-related tragedies in history.

The legacy of Chevron's operations in the Ecuadorian Amazon basin (roughly between 1964 and 1992) is well-documented. During that period, Chevron operated an approximately 1,500 square-mile concession in Ecuador that contained numerous oil fields and more than 350 well sites. The Company deliberately dumped many billions of gallons of waste byproduct from oil drilling directly into the rivers and streams of the rainforest covering an area roughly the size of Rhode Island. Ex. 27 at 703-704. Chevron's operation was grossly substandard by any measure: it violated, *inter alia*, then-current U.S. industry standards, Ecuadorian environmental laws, the Company's contract with Ecuador's government – which prohibited Chevron from using production methods that contaminated the environment – and international law. *Id.*

Chevron now states "there is no evidence that Chevron is responsible for any environmental damage," but its own internal audits of its environmental impact, conducted in the early 1990s by independent outside consultants and placed in evidence in the Ecuadorian case, found extensive contamination at Chevron's oil production facilities.   As an October 1992 report of Chevron's own environmental auditors notes:

> The audit identified hydrocarbon contamination requiring remediation at *all* production facilities and a *majority* of the drill sites . . . . Based on the field observations and the assumptions herein, approximately 50 percent of the drill pad and pit contamination and thirty percent of the hydrocarbon contamination at production facilities was attributed to TEXPET's operations from 1964 through 1990. . . . *All produced water from the production facilities eventually discharged to creeks and streams* except for one facility which used a percolation pit.  None of the discharges were registered with the Ecuadorian Institute of Sanitary Works (IEOS) as required by the Regulations for the Prevention and Control of Environmental Pollution related to Water Resources (1989).

Ex. 49 at E-1-2 (emphasis added).  Plaintiffs did not say that; Chevron's auditors did. And this is only a most miniscule part of an overwhelming 200,000-page record indicting Chevron for its indisputable destruction of the Ecuadorian Amazon.  *See also* Ex. 50 (Apr. 17, 1992 Memo detailing contamination);  Ex. 51 (Jan. 3, 1995 Memo discussing oil discharges into various rivers and tributaries); Ex. 48 (Oct. 1993 Report of Chevron's auditors) at 5-10-14 (noting, among other contamination, "sewage was released on land or stored in pits that emptied into the local river" and "oil emulsion and produced water is discharged into a local creek or river or in some instances directly into the jungle.") and at 6-24 and Tables 6-4- 6-6 (finding "environmental damage that may require extensive mitigative action or may be of long-term duration before recovery," where "contaminants appear to have migrated out of the pit.").

Chevron, of course, knew it had acted improperly, and has spent decades denying, dissembling, and doing anything it can to delay this case. In 1972, for example, the head of Latin American production for Chevron issued a blunt directive to Chevron's acting manager in Ecuador to destroy previous reports of oil spills and to forego documenting future spills in writing unless they were already known to the press or regulatory authorities. Ex. 27 at 703-704. Not much has changed in the thirty-eight years since, given Chevron's position that "there is *no* evidence that Chevron is responsible for *any* environmental damage."

Unable to advance any coherent defense in Ecuador, Chevron comes to this court with a few highly-edited, de-contextualized clips selected from hundreds of hours of outtakes, to justify the most extraordinary of discovery requests: discovery from Plaintiffs' active lead counsel himself. In one of its many false sound bites, Chevron claims that Plaintiffs' "consultants [told] Donziger there is no evidence contamination from the pits spread into the surrounding groundwater." Mot. at 12. Incredibly, Chevron provides no source for this misstatement and conceals from the Court contemporaneous statements by Plaintiffs' consultant, Charlie Champ, where he says:

> The problem with this particular environmental spill is the mixed contaminants. Not only we have oil, not only we have oil, *we also have water with very, very high contents of carcinogenic minerals*, metals plus you have to clean this up right next to an ongoing operation. The contaminants are located all over. *If you just go through the area and you look at a small stream you will see the sheen of the oil on the water. Which means it's still going on.*

Ex. 45 & Ex. 1, CRS 188-2 (emphasis added)). Nor does Chevron reveal the contemporaneous statements from Dick Kamp, another consultant at the meeting:

I think when you're asking whether it's possible to clean up the mess, the real answer is no. It's not possible to clean up the whole mess. The question is what extent of the mess are you going to clean up? And can you, you know, you start with the pits, you can clean the soil, you can get it back. *The ground water is contaminated*. How much? How far? *You know, we know that Texaco is wrong, Chevron's wrong, you know, it's definitely some ground water contaminated, there's discharges that go right in the water ways*, you know, how far are you going to carry this? And then, that's how much we can characterize that, I don't know. I think we're going to have to find experts who've worked in other similar areas to tell us how far they've gone before and how much has been a write-off after a certain point. *They destroyed this area. It's done*. And what the price tag is on however much you can clean or can't clean, I don't know.

*Id.* CRS 196-5 (emphasis added). Nor does Chevron reveal statements from another meeting by Ecuadorian petroleum engineer Olga Lucia Gómez, including "Here is all of the summary charts for the sites inspected. As we can see, the majority of them are sites that supposedly underwent remediation by Texaco. All of them currently show contamination." Ex. 59 (Decl. of Laura Garr dated August 27, 2010 & Ex. 1, CRS 188-1 at 5).

This was only one of many distorted sound bites Chevron has used to justify the extraordinary relief it seeks here; Chevron's selective quotations are of zero credibility.

## II. The Lago Agrio Trial

In 1993, the Amazon communities filed a federal class-action lawsuit against Chevron in the United States District Court for the Southern District of New York, the site of Chevron's global headquarters. *See Aguinda v. Texaco, Inc.*, 303 F.3d 470, 473 (2d Cir. 2002); Ex. 61. Plaintiffs "sought money damages under theories of negligence, public and private nuisance, strict liability, medical monitoring, trespass, civil conspiracy,

and violations of the Alien Tort Claims Act," as well as "extensive equitable relief to redress contamination of the water supplies and environment." *See id.* at 473.

From the lawsuit's inception, Chevron fought vigorously to re-venue the case from the Southern District of New York to the courts of Ecuador.[6] Chevron's motion on *forum non conveniens* and international comity grounds rested on two principal assertions: (1) that the Ecuadorian courts provided an adequate, fair, and neutral forum; and (2) that the evidence and the witnesses were in Ecuador.

For *nine years*, Chevron touted the wonders of the Ecuadorian judicial system, submitting numerous affidavits from experts and its own counsel, and repeating these assertions in extensive briefing. *See*, *e.g.*, Ex. 24, Affidavit of Dr. Rodrigo Perez Pallares (Texaco's attorney) ("the Ecuadorian courts provide an adequate forum for claims such as those asserted by the plaintiffs"); Ex. 28, Texaco Inc.'s Memorandum of Law in Support of Its Renewed Motions to Dismiss Based on Forum Non Conveniens and International Comity ("Ecuador's judicial system provides a fair and adequate alternative forum"); Ex. 30 at 34, Brief for Chevron, U.S. Court of Appeals for the Second Circuit ("Ecuadorian legal norms are similar to those in many European nations.").

The Court of Appeals for the Second Circuit ultimately agreed. It affirmed the Southern District of New York's dismissal of the case, which was conditioned upon Chevron's consent to jurisdiction in Ecuador, in addition to its waiver of certain other defenses should the claims be re-filed there. *See Aguinda,* 303 F.3d at 476.

After final dismissal of the *Aguinda* action in 2002, the Plaintiffs re-filed the case

---

[6]     *See Aguinda v. Texaco, Inc.*, 945 F. Supp. 625 (S.D.N.Y. 1996), *vacated by Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir. 1998); *Aguinda v. Texaco, Inc.,* 142 F. Supp. 2d 534 (S.D.N.Y. 2001), *aff'd*, 303 F.3d 470, 476 (2d Cir. 2002).

in Lago Agrio, Ecuador (the "Lago Agrio Litigation"). Chevron immediately broke the promise it had made as a condition of receiving dismissal from the U.S. courts, and argued, unsuccessfully, that the Ecuadorian courts lacked jurisdiction. This would not be the last time that Chevron's deeds would stand in sharp contrast to its prior, vehement assertions that the Ecuadorian courts provide a "fair" and "adequate" forum: Chevron's aspersions on the Ecuador courts in the Section 1782 proceedings below are just the most recent example.

Trial began in the Lago Agrio Litigation in 2003, and the case remains pending before the Supreme Court of Nueva Loja in Lago Agrio, Ecuador (the "Lago Agrio Court"). The relationship between the parties has been heated, and Chevron's Ecuadorian legal team has defended the case "vigorously" to say the least, infamously resorting to tactics such as menacing and threatening witnesses and their families. Ex. 46. The record contains more than 200,000 pages of evidence, roughly 63,000 chemical sampling results produced by laboratories contracted by both parties and the court experts, testimony from dozens of witnesses, and dozens of judicial field inspections of former Chevron wells and production sites conducted over a five-year period under the oversight of the Lago Agrio Court. Ex. 34. Soil samples from the production wells and separation stations inspected reveal extensive contamination in violation of Ecuadorian law. Ex. 27.

Understandably, Chevron has not provided this Court with a complete transcript of the meetings from which it narrowly quotes. The meeting at the center of its application, for example, is predominantly focused on the overwhelming evidence of

Chevron's pollution.  For example, Mr. Donziger addresses the question of Chevron's

sham remediation as follows:

>STEVEN:  Can I make a very quick point?  If a shadow is
>not falling across these sites.  These are sites that
>underwent quote "remediation" unquote by Texaco.  So
>this is really legal evidence of fraud.  These sites, but we
>need to understand, legally, the remediation of Texaco
>doesn't matter to us in the following way.  We're
>presenting a lawsuit with private persons.  This was a
>matter between Texaco and the government.  So this
>remediation is not really very legally relevant.  The only
>thing that is relevant is whether the place where Texaco
>operated is contaminated or not.  Whether remediation sites
>or other sites.  Another very important thing.  This shows
>that, if they take out all of our evidence, I think that we'll
>win this case.  In other words, Texaco is proving our case.
>With all of their manipulation of the sampling, as can be
>seen in the inspections, they are still drawing soil and water
>samples that violate the laws of Ecuador.  So they
>themselves are corroborating the evidence we are
>presenting.  Both sides corroborate each other.  And this
>means, in my opinion, that the evidence is unassailable.
>How would you say it?
>
>VOICE:  Invaluable.
>
>STEVEN:  Invaluable.  It cannot be attacked.  Because
>even if their own criteria were accepted, if they took out all
>of our samples, all of them, I can argue, using only their
>own samples, that they have proven the plaintiffs' case.
>That's why, as an attorney, I honestly don't understand
>their legal strategy.

Ex. 59 (CRS 188-1 at 5).  Chevron's strategy at the time was incomprehensible – but that

has now changed.  Today, the company has chosen to attack the lawyers because it

cannot attack the evidence.

### III. Chevron's Collateral Attacks on the Lago Agrio Trial: The BIT Arbitration and its Efforts to Invalidate the Cabrera Damages Report

As evidence in the Ecuadorian Litigation mounts against Chevron, the company has sought to use every conceivable method to attack its chosen forum of Ecuador, Plaintiffs, and their attorneys. Threatened by the possibility of a substantial Ecuadorian defeat, Chevron has recently shifted from contesting the merits of the Ecuadorian case to pursuing a three-prong strategy to undermine it: (i) shift the litigation to a new forum (an arbitration); (ii) attack the legitimacy of one of the Court's experts; and (iii) keep the Plaintiffs' attorneys occupied with duplicative, irrelevant discovery in multiple fora across the United States, purportedly "in aid" of (i) and (ii).

Chevron filed a "notice of arbitration" under the UNCITRAL rules pursuant to the U.S.-Ecuador Bilateral Investment Treaty on September 23, 2009. *See generally* Ex. 36. Chevron has asked this private arbitration panel to tell the government of Ecuador to tell the judge to dismiss the Lago Agrio litigation via an order requiring that the Republic's President violate Ecuador's own Constitution, interfere in the country's independent judiciary, and quash a trial brought by his own citizens against Chevron in the very court in which Chevron sought to have the claims heard. Ex. 36 at ¶ 76(3). Under BIT rules, Plaintiffs cannot even be a party to this proceeding. Plaintiffs recently moved to stay the arbitration and that stay motion is currently pending before the Second Circuit. *See Republic of Ecuador v. Chevron Corporation, et al.,* 10-1026 (CON) (2d Cir. 2010); Ex. 8.

Chevron's other tactic (at the heart of this application) is to manufacture a "scandal" concerning Plaintiffs' contacts with the Court appointed damages expert, Richard Cabrera.[7]

Mr. Cabrera is an Ecuadorian expert appointed by the Lago Agrio Court to provide an assessment of the damage from Chevron's pollution of the Amazon. In the course of this work, Mr. Cabrera performed forty-eight separate site inspections. Ex. 46.[8] In addition to the information collected from these field inspections, Mr. Cabrera asked both Plaintiffs and Chevron to "submit to the expert *whatever documentation they believe may be useful in preparing his report*." (Ex. 17; Ex. 46) (emphasis added). Whereas Chevron refused to partake in the process, (Ex. 46), Plaintiffs cooperated with Mr. Cabrera and supplied him with information to support the preparation of a global damages assessment report.

Chevron has petitioned the court to obtain copies of materials submitted by Plaintiffs to Mr. Cabrera, and objected to his consideration of them. The Lago Agrio

---

[7] In a further example of how Chevron's discovery efforts fold in on themselves, Chevron repeatedly references its own arguments in other proceedings to justify those same arguments in this proceeding. *See, e.g.,* Mot. at 4 n. 4; Mot. at 10 n. 6; Mot. at 14 (citing U.S. Filings RJN, Ex. S). In response to Chevron's self-referentially circular argument, Plaintiffs submit their response to Chevron's parallel pleading from that proceeding itself. *See* Ex. 58.

[8] Chevron was present for Mr. Cabrera's inspections, and often tried to obstruct and impede his work. Contrary to court orders, Chevron disturbed the areas where Cabrera was scheduled to perform testing, *e.g.*, using heavy machinery to stir up the ground, interfering with Mr. Cabrera's ability to sample there. Ex. 46. In November 2007, Mr. Cabrera filed an official complaint with the Lago Agrio Court describing how members of Chevron's legal team in Ecuador subjected him to threats and insults when he would conduct his field work. *Id.* As a result, the Lago Agrio Court mandated that Mr. Cabrera and members of his technical sampling team be given law enforcement protection when conducting field work. *Id.*

Court either rejected or deferred these requests, and has not questioned the propriety of Plaintiffs' submission of materials to Mr. Cabrera. Ex. 46.

From his appointment, Chevron has gone to great lengths to discredit Mr. Cabrera. Chevron has filed no fewer than thirty separate motions in the Lago Agrio Court attacking Mr. Cabrera's qualifications, credibility, processes, and findings. Chevron has attempted to have the Cabrera Report stricken on bases ranging from Mr. Cabrera's alleged indirect relationship to Ecuador's state-owned oil company, to the accusation that the Court gave Mr. Cabrera insufficient time to conduct a study of that magnitude, to the claim that Mr. Cabrera failed to properly accept his appointment. The company propounded ten sets of interrogatories and complaints concerning his final report. Ex. 46. It made an approximately 1,000-page submission to Mr. Cabrera to which he has completely responded. *Id.*

In motions filed in Lago Agrio, Chevron has repeatedly asserted that "[m]uch of Cabrera's 'independent' report in this case was not authored by Cabrera at all, but rather was the work product of plaintiffs' representatives, consultants, and allied sponsors." Ex. 55 at 10. Nevertheless, the Lago Agrio Court has never stated that under Ecuadorian law, procedure, or the law of the Lago case, it would be improper at all for Cabrera to rely on documents produced by Plaintiffs in drafting the report.

## IV. Chevron's Own Ex-Parte Contacts With the Lago Agrio Court

Chevron's entire § 1782 campaign is perched on the faulty premise that *ex parte* contact with court experts in Lago Agrio is a "fraud." But not only has Chevron never

denied that Chevron's own lawyers met *ex parte* with court experts, it is now clear that

Chevron's lawyers repeatedly met secretly and *ex parte* with *the court*.[9]

Plaintiffs have now obtained declarations from two Ecuadorians who worked on

the Lago Agrio case, in conjunction with the Plaintiffs' team, who witnessed Chevron's

attorneys repeatedly meeting *ex parte* with the court in Lago Agrio, concerning Richard

Cabrera and other aspects of the case.  Robinson Yumbo Salazar has testified that:

> On multiple occasions, I personally saw the lawyers who
> represent Chevron Corporation in the Lago Agrio case,
> their technical personnel and their security guards, meeting
> alone with the judge in charge of the case, without the
> presence of the plaintiffs' lawyers. . . .  I especially
> remember two cases where I saw Iván Alberto Racines, a
> lawyer of Chevron in the Lago Agrio case, and other
> lawyers of Chevron whose names I do not remember,
> meeting with Doctor Germán Yánez Ruiz, who was the
> judge of the case at the time. These meetings were without
> the participation of the Plaintiffs' representatives in the
> Lago Agrio case."

Ex.  52 (Decl. of Robinson Yumbo Salazar) ¶¶ 4-5.

Corroborating this pattern of ex parte interactions between Chevron lawyers and

the Lago Agrio court, Donald Rafael Moncayo Jimenez, has testified that

> [o]n multiple occasions, I personally saw the lawyers who
> represent Chevron Corporation in the Lago Agrio case
> meeting alone with the judges who heard the case without
> the presence of the plaintiffs' lawyers.

Ex. 60  (Decl. of Donald Rafael Moncayo Jimenez) ¶ 3.  Mr. Moncayo provided details

concerning a particular incident in the summer of 2007 where he "saw attorneys Adolfo

Callejas Ribadeneira and Ivan Alberto Racines (lawyers of Chevron), and Dr. Efraín

---

[9]     There is some irony that one of Chevron's sources for its argument that it is pursuing discovery under § 1782 in "good faith," is an order it drafted word for word, and obtained *ex parte*.  *See* Mot. at 19 (citing, *inter alia*, U.S. Filings RJN, Ex. E, 2).

Novillo (who was in charge of the case at the time) in the offices of Judge Novillo. They were talking about the expert designated by the Judge, Mr. Richard Cabrera." *Id.* ¶ 4. When he "approached the offices, the private security guards of Chevron and a Chevron technician tried to chase [him] away." *Id.* Mr. Moncayo describes another incident where Judge Juan Núñez, then-President of the Provincial Court of Justice of Sucumbíos, "was talking to Dr. Diego Larrea and Alberto Racines about the inspection of the Auca wells and other stations, where there were oil wells, topic of the Lago Agrio case." *Id.* ¶ 5.

These revelations make plain the blazing hypocrisy of this company. Notwithstanding their pious invocations of fair play and phony outrage over a meeting between plaintiffs and a court expert, Chevron's own lawyers met *ex parte*, not merely with an expert, but with the court itself. It did so on multiple occasions. And when this secret conduct was discovered, Chevron's security guards tried to keep any witnesses to this conduct away.

**V.      The Matter of Plaintiffs' Contacts Is Pending In Ecuador**

These secret, *ex parte* contacts by Chevron's own lawyers are just some evidence of the bankruptcy of Chevron's manufactured "scandal" concerning Mr. Cabrera. For Chevron has still to identify a single order, a single rule, a single regulation, or a single law prohibiting *ex parte* contact between either party and the court experts in the Lago Agrio case. And Chevron has never denied that its *own* lawyers met *ex parte* with court experts in Lago Agrio.

In addition to all of this, the question of contacts between Plaintiffs and Cabrera is already before the Lago Agrio Court. For example, Plaintiffs have stated to that Court,

*inter alia,* that:

> Plaintiffs took advantage of the opportunity to advocate their own
> findings, conclusions, and valuations before Cabrera for him to
> consider their potential adoption.  The information provided to
> Cabrera by Plaintiffs' counsel included proposed findings of fact
> and economic valuations for the environmental and other damages
> caused by Texpet's practices and pollution.  Cabrera was, of
> course, free to adopt, wholly or in part, plaintiffs' views, proposed
> findings and valuations.  And, in fact, apparently finding them
> credible, Cabrera adopted the proposals, analyses, and conclusions
> of the Plaintiffs concerning the damages and the valuation.

> It is essential to stress the fact, Your Honor, that Cabrera's
> adoption of scientific findings, conclusions, and valuations
> proposed by Plaintiffs is similar to Chevron's own relationship
> with Gerardo Barros, another Court-appointed expert in this
> litigation, and his dealings with it.  On a number of occasions,
> Chevron submitted materials to Barros for his consideration and
> inclusion in his report: by briefs submitted on January 29 and
> February 25 2010, Chevron's counsel submitted several thousand
> pages of new documents to be considered by Barros in his report.
> Just as Cabrera had accepted and credited plaintiffs' submissions,
> Barros accepted Chevron's documents, and incorporated them into
> his work and report.  The Plaintiffs did not object to that practice
> because it was not in conflict with the habitual practices carried out
> during this litigation.  In spite of this, Chevron persists with its
> hypocritical claim that plaintiffs' similar conduct was somehow
> inappropriate.  Your Honor, you should reject Chevron's
> allegations in this regard.

Ex. 11 at 6-7.  The submission concluded:

> In conclusion, we believe there is sufficiently ample basis in the
> record before this Court to allow it to render a judgment containing
> just and appropriate redress without the need to include additional
> evidence.  Nonetheless, in the interest of satisfying Chevron's
> vehemently expressed (albeit fabricated) "concerns," and so as to
> assure that this trial may proceed to conclusion without further
> delay and distraction resulting from Chevron's attacks in foreign
> courts, the Plaintiffs on the basis of numeral 1 of Art. 330 of the
> Judiciary Code take the liberty of submitting the following
> recommendation: That each of the parties be ordered to submit to
> the Court, within the term of 30 days, final, supplemental
> information to guide the Court in arriving at a global damage

assessment, given the record evidence adduced during this trial over the past seven years.

Following the submission of this supplemental information by each party, the parties shall be granted a final term of 15 days during which they may comment on the information submitted by the opposing party. After the conclusion of this comment period, you, Your Honor, may proceed to the portion of this litigation so that a final judgment can be rendered.

*Id.* at 7. Notwithstanding Chevron's hyperbolic claims of fraud, collusion, and the like, the Ecuadorian court — which is the only court with knowledge of Ecuadorian law, procedure, and this case, and the only court in a position to rule on those issues — has given no indication that such contacts were or are improper. In response to this filing, the Lago Agrio court did not chastise the Plaintiffs. Nor did it suggest in any way, that under the law of *Ecuador* – the forum, after all, that *Chevron* chose, Exs. 23-31 – Plaintiffs committed any impropriety whatsoever.

Rather than reprimand Plaintiffs, at Plaintiffs' request, the Lago Agrio Court has now ordered that both parties be given the opportunity to provide their *own* submissions concerning damages to *supplement* that which is already before the Court. Ex. 12.[10] To the extent Chevron believes that the Cabrera report is unsound for whatever reason ("collusion," bad science, or whatever else), it now has the opportunity to produce its own *extra* submission to the Court, in addition to the seven-year, 200,000-page trial record.

---

[10] Applicants demand an accelerated schedule here – despite the breadth of their subpoenas – by using this Court's previous observations about its understanding that the Ecuadorian Plaintiffs are trying to close the evidentiary phase of the litigation in Lago Agrio. Mot. at 5. Chevron knows this is misleading. The Lago Agrio Court has previously admonished Chevron and its counsel that "the evidentiary period allowed in this action *ended* quite some time ago." Ex. 11 (emphasis added). And Plaintiffs sought to *expand* the time below for submission of damages materials, not contract it. *Id.* at 6-7.

Surely, any litigant with a professed desire for more due process would welcome such a development. Not Chevron. Chevron opposed the motion, and remarkably, announced it had no interest in filing a supplemental damages submission to the Court. Ex. 13 (referring to filings by Dr. Callejas, counsel for Chevron). The Court, however, rejected Chevron's cynical and completely indefensible position. Exs. 12, 13 ("ordering the parties to comply with the provisions of the order of August 2, 2010"). Against its own wishes, Chevron now has the opportunity to provide a damages assessment directly to the Court. If at all credible, Chevron's submission will necessarily conclude that Chevron was responsible for some measure of damages.

Chevron's accusations that Plaintiffs' lawyers have made misrepresentations ignore Plaintiffs' submission to the Ecuadorian Court, and that Court's response.[11] If its justification for discovery here is based on these same critiques, discovery is unnecessary as the Lago Agrio Court already has these facts before it. If its discovery is in aid of its argument that it is dissatisfied with the judicial system it fought tooth and nail to litigate in, that complaint was waived by Chevron during a nine-year effort to transfer the case to Ecuador.

## ARGUMENT

### I.     Plaintiffs Incorporate Mr. Donziger's Brief in Support of His Motion to Quash the Subpoenas

For the reasons set forth in Mr. Donziger's brief and supporting declarations and exhibits, incorporated here by reference, *see* Donziger Br. § I, the applicants' subpoenas

---

[11]     As Judge Lynch noted at oral argument with respect to representations made by Chevron's counsel, "we now know we have to make very clear what you're representing and what you're not representing." Ex. 46 at 53.

should be quashed.  Plaintiffs' motion to quash the subpoenas should also be granted for the additional reasons set forth below.

## II.    The Subpoena of Opposing Counsel is Disfavored and the Court Should Quash the Subpoenas Pursuant to Rule 26

Mr. Donziger is a central part of the Plaintiffs' litigation team.  The proposed subpoenas would be enormously prejudicial because they would completely consume him at the same time that he is trying to coordinate an international prosecution of this litigation.  The distraction and obstruction caused by the proposed subpoenas substantially add to the extraordinary burdens already placed on the Plaintiffs to respond to Chevron's mounting discovery efforts across the United States.  This burden includes the time required to compile and review potentially responsive materials spanning decades, time to prepare for a deposition, the deposition itself, and the substantial cost of retaining counsel.

These burdens require special consideration, as noted by the Second Circuit and other courts.  *See, e.g.*, *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 70 (2d Cir. 2003) (Sotomayor, J.) ("Courts have been especially concerned about the burdens imposed on the adversary process when lawyers themselves have been the subject of discovery requests, and have resisted the idea that lawyers should routinely be subject to broad discovery.").  The Second Circuit has, in dicta, suggested that such burdens should be analyzed in a "flexible" approach pursuant to Fed. R. Civ. Pro. 26, including such factors as "the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted."  *In re Dennis Friedman*, 350 F.3d at 72.

Each of these factors weighs in favor of quashing the subpoena. As noted above, the question of Plaintiffs' contacts with and submissions to Cabrera is before the Ecuadorian court, and there is thus no need to seek further discovery on this matter. If it is relevant to the Ecuadorian court, the Ecuadorian court will act.

There is no question that Mr. Donziger is actively involved in this litigation as an attorney. As discussed below, privilege and work-product issues are necessarily intertwined with the discovery Chevron seeks. Finally, there have already been hundreds of thousands of pages of documents produced in this case in Ecuador, and Chevron has already sought testimony from twenty-three other people in § 1782 petitions throughout the country seeking similar information. Given that each of the factors noted by the *Dennis Friedman* court weigh in favor of quashing the subpoena, the Court should exercise its discretion under Rule 26 and do so. *See, e.g.*, *Sea Tow Int'l, Inc. v. Pontin*, 246 F.R.D. 421, 428 (E.D.N.Y. 2007) (quashing subpoena directed at attorney where it was "nothing more than another attempt by defendants to bootstrap [the attorney] as a fact witness in the hopes of disqualifying him from this litigation entirely").

### III.  The Subpoenas Seek Privileged Materials and Testimony

Section 1782 expressly provides that "[a] person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege." 28 U.S.C. § 1782(a). Chevron's subpoena seeks materials subject to multiple privileges, and thus should be quashed on that basis alone.

#### a.  Attorney-Client Privilege Applies

Chevron seeks to subpoena vast amounts of material from Plaintiffs' attorney protected by the attorney-client privilege. Where, as here, a subpoena "requires

disclosure of privileged or other protected matter and no exception or waiver applies," the subpoenas must be quashed. Fed. R. Civ. P. 45 (c)(3)(A)(iii).

"To invoke the attorney-client privilege, a party must demonstrate that there was: (1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice." *United States v. Constr. Prod. Res., Inc.*, 73 F.3d 464, 473 (2d Cir. 1996).

The subpoenas here improperly call for the production of attorney-client materials. They repeatedly demand documents and communications with "PLAINTIFF AFFILIATED PERSONS," defined to include plaintiffs, their lawyers, their experts, and anyone "directly or indirectly assisting" them. Ex. 54 at ¶ 32. There is no serious dispute that the materials sought include communications between Mr. Donziger and Plaintiffs, his clients, which were intended to be confidential, and were made for the purpose of obtaining or providing legal advice.

### b. Work Product Privilege Applies and Has Not Been Waived by Disclosures to Cabrera

In addition to the documents and testimony covered by the attorney-client privilege, the subpoenas improperly seek vast amounts of material covered by the work product privilege, including communications between Plaintiffs' counsel. But even the materials allegedly at the core of the Chevron petition – communications with Cabrera – are in the context of this case privileged.

"The attorney work product doctrine provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial." *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007) (citation omitted). This protection applies to both "fact" and "opinion" work product. *Id.*

"Opinion" work product is protected if there is a real concern "that the work product will reveal counsel's thought processes in relation to pending or anticipated litigation." *Id.* at 183-84.

Chevron's essential argument is that work product is waived when Plaintiffs' counsel or their consulting experts provided information to Cabrera. Chevron has the burden to prove waiver, *see La. Mun. Police Employees Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 311 (D.N.J. 2008), and in the context of this Ecuadorian case, it fails.

Unlike the attorney-client privilege, which is generally waived through disclosure to third parties, the work product is only waived by disclosure to an *adversary* or a conduit to an adversary. *See In re Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir. 1993) ("The waiver doctrine provides that voluntary disclosure of work product to an adversary waives the privilege as to other parties"); *William A. Gross Constr. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.*, 262 F.R.D. 354 (S.D.N.Y. 2009) (quoting *ECDC Envtl., L.C. v. N.Y. Marine & Gen'l Ins. Co.*, No. 96 Civ. 6033, 1998 WL 614478 at *4 (S.D.N.Y. June 4, 1998)) ("Disclosure of material protected by the work-product doctrine . . . results in a waiver of the protection afforded by that doctrine only when the disclosure is to an adversary or materially increases the likelihood of disclosure to an adversary.") (alteration in original)); *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 229 F.R.D. 441, 447 (S.D.N.Y. 2004) (to find waiver "court must first find that the third party to whom documents were disclosed should be conceived of as an adversary or a conduit to a potential adversary").

First, Cabrera is not an "adversary"; Chevron is. Second, and in stark contrast to a U.S. testifying expert – generally compelled by Federal Rule of Civil Procedure

26(a)(2) to disclose to the adversary what any consultant may have shared with him – Mr. Cabrera and his technical experts are not conduits to a potential adversary. Ecuador has different procedural rules and no analogue to Rule 26; party submissions to Mr. Cabrera were confidential and not subject to any required disclosure to the adversary. Ex. 42 ¶ 8; Ex. 43 ¶¶ 6-7. In Ecuador, a party may request clarification and explanation of an expert report by propounding interrogatories on the expert, just as Chevron has done countless times with respect to the Cabrera Report. Ex. 43 ¶ 5. If the responses provided by the expert are deemed unsatisfactory, a party may move to strike – as Chevron has done – and that motion will be considered at the time of judgment. Ex. 42 ¶ 7; Ex. 43 ¶ 9. There is thus no basis to conclude that a disclosure to Mr. Cabrera should be given the same legal effect as a disclosure to a U.S. testifying expert, and thus Chevron has failed to meet its burden in showing waiver.

If Chevron were entitled *under Ecuadorian law* to any work product of Plaintiffs' consultants that may have been reviewed by Mr. Cabrera, it would already have them. It does not. That Chevron has not been able to procure such documents in Ecuador confirms that: (i) disclosure to Mr. Cabrera cannot be equated to disclosure to a U.S. testifying expert; (ii) documents submitted to Mr. Cabrera are not shared with the adversary as a matter of course in Ecuador; and thus (iii) the work product protection has not been lost. Accordingly, any work product given to Mr. Cabrera remains privileged and shielded from discovery.

### c. Much of any Disclosure to Ecuador or Its Representatives is Subject to the Common Interest Privilege

Most of the communications between Mr. Donziger and Ecuador or its representatives case since 2006 are protected by the common interest privilege as a direct

result of Chevron bringing suit against Ecuador – first in this Court and, subsequently, in successive international arbitrations – in each and every case injecting into such disputes issues that lie at the core of the Lago Agrio litigation.[12]

Although petitioners categorically state that privilege is waived when confidential information is communicated to a third party, the "common interest rule" is an exception to this general rule, and serves as "an extension of the attorney-client privilege." *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989) (quoting *Waller v. Financial Corp. of Am.*, 828 F.2d 579, 583 n. 7 (9th Cir. 1987). "The common interest doctrine "permits the disclosure of a privileged communication without waiver of the privilege provided the party claiming an exception to waiver demonstrates that the parties communicating: (1) have a common legal, rather than commercial, interest; and (2) the disclosures are made in the course of formulating a common legal strategy." *Merck Eprova AG v. ProThera, Inc.*, 670 F. Supp.2d 201, 211 n.4 (S.D.N.Y. 2009) (quoting *Sokol v. Wyeth, Inc.*, No. 07 Civ. 8442, 2008 WL 3166662, at *5 (S.D.N.Y. Aug. 4, 2008)); *see also In re Federal Trade Commission*, No. M18-304, 2001 WL 396522, at *2 (S.D.N.Y. April 19, 2001). The common interest rule applies regardless of whether

---

[12]    For example, Chevron defends the Lago Agrio litigation, in part, on the basis that a 1995 Settlement Agreement by and between the Republic and Chevron released the company not only of claims owned by the Republic, but also of claims owned by third parties (including the Lago Agrio Plaintiffs) even though (1) the release, by is terms, was limited to claims owned by the Republic and the state-owned oil company, (2) the Memorandum of Understanding executed by the parties that led to the Settlement Agreement expressly provided that the agreement would not prejudice rights possibly held by third parties, (3) Chevron's own counsel admitted in deposition testimony that the Settlement Agreement "carved out" all third party claims, and (4) under Ecuadorian law, the Republic could not have waived right held by third parties. Chevron raised the identical issue in litigation against the Republic, arguing that the Republic breached its Settlement Agreement obligations by "allowing" the Lago Agrio litigation to proceed at all because third-party claims allegedly had been "released" by the Republic.

actual litigation is in progress or whether the parties are parties to an action, so long as some "common interest in a legal matter" exists. *See Schwimmer*, 892 F.2d at 243-44.

To take advantage of the common interest rule, a party must show "that the communication in question was given in confidence and that the client reasonably understood it to be so given," *Schwimmer*, 892 F.2d at 244, in addition to "a showing of 'actual cooperation toward a common legal goal.'" *Am. Eagle Outfitters, Inc. v. Payless ShoeSource, Inc*., No. CV 07-1675(ERK)(VVP), 2009 WL 3786210, at *2 (E.D.N.Y. Nov. 12, 2009) (quoting *In re Rivastigmine Patent Litigation*, No. 05 MD 1661, 2005 WL 2319005, at *4 (S.D.N.Y. Sep. 22, 2005)).

Having injected the Lago Agrio dispute into its litigations and arbitrations with the Republic, Chevron cannot claim surprise that the Republic's U.S. lawyers have chosen to communicate with the lawyers for the Lago Agrio Plaintiffs regarding those matters where the Republic and Donziger's clients have a common interest. Accordingly, a common interest privilege protects communications between Donziger and representatives of the Republic of Ecuador with respect to (i) Chevron's suit in the Southern District of New York against Ecuador in an effort to commence an arbitration before the American Arbitration Association; (ii) Chevron's commencement of two successive international arbitrations against Ecuador under the United States-Ecuador Bilateral Investment Treaty; (iii) Ecuador's and the Lago Agrio Plaintiffs' petitions to stay the most recent international arbitration filed in the Southern District of New York (and the appeal); and (iv) various § 1782 actions in the United States. In each instance, certain litigated issues – sometimes legal issues sometimes fact issues – gave rise to a

common legal interest and the formulation of relatedly common legal strategies.  Such documents are protected.

### d.  The Crime Fraud Exception Does Not Apply

Applicants' invocation of the crime-fraud exception does not save these subpoenas.  To pierce either the work product or attorney-client privilege under the crime-fraud exception, Applicants have the burden to present evidence proving that legal advice was provided in furtherance of an illegal act or fraud.  *See U.S. v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997); *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986).  Specifically, they must show (1) that "there is probable cause to believe that a crime or fraud has been attempted or committed" and (2) "that the [attorney] communications were in furtherance thereof."  *United States v. Richard Roe, Inc.*, 68 F.3d, 40 (2d Cir. 1995); *Jacobs*, 117 F.3d at 87 (2d Cir. 1997) (same).

The crime-fraud exception is not a fishing expedition—bare assertions of a crime or fraud are simply insufficient to obtain privileged attorney-client communications and work product.  *Shahinian v. Tankian*, 242 F.R.D. 255, 258 (S.D.N.Y. 2007) ("[T]he reasonable basis for concluding that a crime occurred and that the attorney was used to commit or facilitate the crime must first be established . . . the [crime-fraud] exception is never properly used to probe the possibility of a crime.") (emphasis added); *In re Richard Roe, Inc.*, 168 F.3d at 71 (showing only that privileged communications "*might* provide evidence of a crime or fraud" is insufficient to invoke the exception (emphasis added)); *see also Official Committee of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 342 B.R. 416, 427 (S.D.N.Y. 2006) (declining to apply crime-fraud exception because record was deficient of evidence of a crime or fraud).

Applying these principles to this case, Chevron must demonstrate *prima facie* evidence that Plaintiffs' Counsel were complicit with Mr. Cabrera in some activity that rises to the level of criminal or fraudulent action under Ecuadorian law. The facts of this case do not come close to meeting this standard. The record in the Lago Agrio Litigation clearly demonstrates that the Ecuadorian Court not only knew the parties would be transmitting information and data to Mr. Cabrera and his technical experts – it encouraged the transmission of such information and data in the broadest possible sense. (Ex. 17 ("[T]he parties may submit to the expert *whatever documentations they believe may be useful* in preparing his report." (emphasis added)); Ex. 46 ¶¶ 16-20.) The order also provided that "[a]s this information is not evidence . . . it was ordered to be delivered directly to the expert, its recipient." *Id.* Under Ecuadorian civil practice, "[o]btaining technical information from the parties or a third party is not considered a breach of the expert's independence." (Ex. 43, Neidl Decl. ¶ 10) In fact, the Ecuadorian Plaintiffs have openly represented to the Lago Agrio Court that "Plaintiffs took advantage of the opportunity to advocate their own findings" and submitted to Mr. Cabrera "proposed findings and valuations." Ex. 11 at 6-7.[13]

Because they have failed to show probable cause for *any* illegal conduct, Chevron has not met its burden and cannot invoke the crime-fraud exception.

---

[13]     Even if Chevron could meet its burden of demonstrating a *prima facie* case of "crime" or "fraud" (it cannot), this Court should then review the allegedly impugned materials *in camera*, to consider the crime-fraud exception on a document-by-document basis. In determining whether and how to apply the crime-fraud exception, a district court should "vigorously test the factual and legal bases" asserted by the discovering party, including potentially through the use of "in camera inspection." *In re Grand Jury Subpoena*, 223 F.3d 213, 219 (3d Cir. 2000); *United States v. Zolin*, 491 U.S. 554 (1989), *see also* Edna Selan Epstein, The Attorney-Client Privilege and the Work-Product Doctrine 707 (5th ed. 2007).

Messrs. Veiga and Perez's summary invocation of the crime-fraud exception fares no better. Their unsupported claim that the entire case is "an elaborate fraud," Perez/Veiga Br. 23, is meritless, and they fail anywhere to explain the "impropriety" of Donziger's alleged advocacy for the criminal prosecutions of persons (including themselves) who certified Chevron's "remediation" of toxic waste sites. Nor do they explain how or why such advocacy would be relevant in their criminal case, much less how it justifies the extraordinary burden of a subpoena of a lawyer in the midst of an active litigation.

IV.     **The Subpoenas Fail Under All of the *Intel* Factors**

Chevron's subpoena also fails to meet the standards for section 1782 discovery under *Intel*. The subpoena is highly intrusive and burdensome, *see, e.g., In re Apotex, Inc.*, 2009 WL 618243, at *3-4 (S.D.N.Y. Mar. 9, 2009) and requires the disclosure of confidential, privileged information from the adversary's attorney, *see, e.g., In re Microsoft*, 428 F. Supp. 2d 188, 196 (S.D.N.Y. 2006) (looking at confidentiality and/or privilege in evaluating burden factor). This is particularly the case given the remarkable breadth of the subpoenas, the target of the subpoenas (an active lawyer in an ongoing litigation), and the time, effort, and expense of pouring through potentially almost two decades' worth of material in the midst of a hotly-contested and (to put it mildly) active litigation now spanning three continents, as well as the cost of retaining counsel to aid in this herculean effort. As in *Apotex*, the burdensomeness factor alone compels dismissal of the petition.

The application also disregards a pending application before the Ecuadorian Court concerning that Court's receptivity to the evidence gathered in Chevron's various § 1782

applications around the United States, Ex. 5; *see Schmitz v. Bernstein Liebhard &*
*Lifshitz*, LLP, 376 F.3d 79, 84 (2d Cir. 2004); *In re Microsoft*, 428 F. Supp. 2d 188, 194
(S.D.N.Y. 2006); "is untimely given the current procedural posture of the case before the
[Ecuadorian] Courts," *Aventis Pharma v. Wyeth*, 2009 WL 3754191, at *1 (S.D.N.Y.
Nov. 9, 2009), given, *inter alia*, that as the Lago Agrio court held, "the evidentiary period
allowed in this action ended quite some time ago," Ex. 6, at 16 (line 4); is also untimely
given Chevron's multi-year delay for filing any § 1782 petitions, including the petition
against Donziger; is a plain attempt to circumvent foreign proof-gathering restrictions,
given, *inter alia*, that the Lago Agrio court has jurisdiction over experts in Ecuador,
including Mr. Cabrera, and documents given to Cabrera, *see In Re Application of OOO*
*Promnefstroy*, No. 2009 WL 3335608, at *8 (S.D.N.Y. Oct. 15, 2009); *Microsoft*, 428 F.
Supp. 2d at 195 (same); *Aventis*, 2009 WL 3754191, at *1; violates "other policies of . . .
the United States," *Intel*, 542 U.S. at 265, including policies of comity, *see Schmitz*, 376
F.3d 79, and estoppel (arising from Chevron's broken promises to litigate in Ecuador, not
before a BIT tribunal), *see New Hampshire v. Maine*, 532 U.S. 742, 750 (2001); and is an
unseemly effort to use American courts to attack the Ecuadorian court Chevron sought
for nine years in a successful attempt to escape American justice in this very district.

As to the receptivity prong of *Intel*, the Ecuadorian Court's August 2, 2010 Order,
Ex. 12, contains the clearest proclamation that it does not want additional evidence
concerning the alleged "fraud" in the genesis of the Cabrera Report. After
acknowledging that Chevron has made several motions attacking the report on that basis,
the Court reminds the parties that "the judge is not required to agree with the opinion of
the experts," and then invites the parties, instead of additional submissions on that

subject, to submit additional materials "setting forth and justifying their positions on the economic and applicable criteria for environmental damage remediation." *Id.* Finally, the Court emphasizes that these additional submissions are not a "prejudgment at the discretion of the court as to the existence of any damage." *Id.*

To the extent any of the material Chevron now seeks is allegedly for use before the BIT tribunal, the attempt is also improper. The BIT proceeding may shortly be enjoined by the Second Circuit, see Ex. 8 (unofficial transcript of Second Circuit oral argument); Ex. 27 (Complaint to enjoin Chevron's participation in BIT proceeding); the tribunal likely does not even have jurisdiction under BIT rules and refused Chevron's request for a merits hearing until it held a separate hearing to consider whether it even has jurisdiction, Ex. 9 at 150-51; and in any event the BIT tribunal is not a foreign tribunal within § 1782, *see NBC v. Bear Stearns & Co.*, 165 F.3d 184, 186 (2d Cir. 1999).

Chevron's nationwide discovery effort has run wildly out of control. Although the Federal Rules of Civil Procedure provide a default of ten depositions for a domestic federal case (Fed. R. Civ. P. 30), Chevron has circumvented this restriction by filing in [ten] different jurisdictions purportedly "in aid of" the Lago Agrio case. Mr. Donziger is the *twenty-third* respondent. Chevron alone has now made 262 separate filings across these ten cases comprising more than 22,000 pages of exhibits, filings and briefs. This avalanche of litigation involves massive duplication and an extraordinary drain on the judiciary to prove a point that has already been disclosed to the Lago Agrio Court. This epic detour is antithetical to the discovery contemplated by 28 U.S.C. § 1782, and is not truly in aid of any foreign proceeding.

**CONCLUSION**

For the foregoing reasons, the Lago Agrio Plaintiffs respectfully submit that the subpoenas be quashed.

Dated: New York, New York
August 27, 2010

EMERY CELLI BRINCKERHOFF
& ABADY LLP

/s/ O. Andrew F. Wilson
_____
Jonathan S. Abady
Ilann M. Maazel
O. Andrew F. Wilson
Adam Pulver

75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000

*Attorneys for Lago Agrio/*
*Ecuadorian Plaintiffs*